[No. 2622.   Decided February 18, 1898.]

## W. C. BARDSLEY, *Appellant*, v. W. A. STERNBERG, *Treasurer*, *Respondent*.

MUNICIPAL CORPORATIONS — PAYMENT OF WARRANTS — WHAT CONSTITUTES — CITY FUNDS — AUTHORITY OF TREASURER TO RECEIVE AND CONTROL — DEPOSIT IN BANK — EVIDENCE AS TO STATE OF FUNDS.

The act of a city treasurer in buying the city's warrants and paying for them with city funds does not constitute a payment, when the warrants are thus cashed out of their proper turn without any view of treating them as paid by the treasurer, but for the purpose of reselling them to investors and placing the funds realized from their sale to the city's credit. (SCOTT, C. J., and REAVIS, J., dissent.

The report of the finance committee of a city council, which by charter is charged with the duty of examining the books and accounts of the city treasurer and comptroller and ascertaining the amount of cash on hand, is, after adoption by the city council, competent evidence as to the state of the city funds for the period covered by the report. (SCOTT, C. J., and REAVIS, J., dissent.)

A municipal corporation can act only through legally constituted officers and agents; hence, the act of its treasurer in

receiving money and placing same to the city's credit upon the reissuance of warrants bought by him, constitutes a receipt by the city itself of the proceeds of the warrants sold. . (SCOTT, C. J., and REAVIS, J., dissent.)

The depositing by a city treasurer of public funds intrusted to his keeping in a bank for safe-keeping, subject to repayment on demand, is neither a loan nor an investment of the funds, and hence not illegal within the contemplation of the statute making it criminal and illegal for a city treasurer to make a profit by loaning or otherwise using such funds contrary to law.

Appeal from Superior Court, Pierce County.—Hon. J. A. WILLIAMSON, Judge. Reversed.

*Crowley & Grosscup,* and *A. E. Buell,* for appellant.

*John P. Judson, J. C. Stallcup,* and *D. F. Murry,* for respondent.

The opinion of the court was delivered by

ANDERS, J.—This was an application by the appellant (plaintiff below) to the superior court of Pierce county for a peremptory writ of mandate commanding the respondent (defendant below) as treasurer of the city of Tacoma to pay five certain warrants of said city. The affidavit in support of the motion for the writ specifically described each of the warrants in suit, and averred that the plaintiff below was the owner and holder thereof, and that they were regularly issued and were outstanding and unpaid; that they had been indorsed by the city treasurer " not paid for want of funds;" that they were drawn on the general fund during the months of July, August, September and October, 1892; that they were presented to the defendant as treasurer for payment, and payment was refused, and that said treasurer had in his hands money sufficient to pay the same, and applicable to the payment thereof. Due notice of the application having been given, the defendant below appeared and answered, setting up among other things as de-

fenses, (1) That two of the warrants were issued to councilmen of the city, and were therefore illegal and void, and (2) that four of said warrants, including one of the salary warrants, had been presented to the treasurer of the city and paid by him with money of the city to the credit of the general fund, but that the then treasurer failed and neglected to cancel the same and that they thereafter, and without consideration, wrongfully came into the possession of the plaintiff. To this answer the plaintiff replied, denying the invalidity of the two salary warrants, as well as the allegations of payment, and upon the issue thus presented a trial was had and judgment was rendered in favor of the defendant for costs, and dismissing the action. Upon appeal to this court the judgment was affirmed. See *Bardsley v. Sternberg*, 17 Wash. 243 (49 Pac. 499). The cause was originally submitted to this court upon the printed briefs of the respective counsel, and, upon petition of appellant, a rehearing was granted, and the case was subsequently fully and ably argued by counsel upon both sides. And the writer hereof feels constrained to say that the argument of counsel and a re-examination of the entire record have convinced him that his conclusions on the former presentation of the case, respecting some material questions, and especially as to the effect of certain documentary evidence contained in the record, were erroneous. When the cause came on for trial in the court below, the respondent, conceiving that the burden of proof rested upon him, requested, and was permitted by the court, to open and close the case; and the trial proceeded accordingly. It is conceded that the warrants in question, other than the two drawn for salary of councilmen, were properly issued in the first instance and evidenced just obligations of the city; and there is therefore no question as to their original validity. It is also conceded that the books of the city comptroller show that

all of them are still unpaid and outstanding. The evidence shows that from November, 1890, to April, 1894, one George W. Boggs was the treasurer of the city of Tacoma, and that, during that time, it was his general custom, when current warrants on the general fund were presented to him, to give the payee or holder thereof the amount called for by the warrants and to require the payee to indorse his name on the back thereof, such warrants being payable to the person therein named, or order; that the treasurer then placed the warrants in the cash box in his safe, where they were kept and treated by him as so much money, until disposed of to third parties. When several of such warrants had accumulated, they were taken out of the cash drawer by the treasurer, or by his deputy or bookkeeper, and classified and listed. This listing consisted in placing the number, date and amount of each warrant on a memorandum sheet, and, after this was done, the list was copied in a letter press copy book and the original list was attached to the warrants therein listed. These warrants, with the list attached, were then delivered to some third party, or parties, at which time they were indorsed by the treasurer "not paid for want of funds." When these warrants were delivered to a purchaser they were paid for at par, and the amount received was placed in the drawer from which the warrant was taken. But not all of these warrants were thus disposed of. Some of them were deposited in the bank where the treasurer kept part of the funds of the city, and, in such cases, they were ordinarily credited to the city as a deposit of so much actual cash, and the bank afterwards sold them to its customers. That all of the warrants in suit, except that issued to councilman Boardman, passed through the hands of the city treasurer in the manner above indicated, is not disputed. And whether or not the evidence proves an absolute payment of the warrants is a ques-

tion upon which the learned counsel for the respective parties entertain radically different opinions, and which we are again called upon to determine. It is insisted, with much earnestness on behalf of respondent, that when the original holders of these warrants received the amount of money mentioned therein from the treasurer, from the fund upon which they were drawn, the warrants were thereby absolutely paid and extinguished, and no act or intention of the treasurer could give them any force or vitality thereafter. But we are of the opinion that the mere fact that the holder of a city warrant receives the money of the city and delivers up the warrant to the regular disbursing officer does not necessarily constitute payment, so far, at least, as such officer is concerned. It was in effect so held by the supreme court of Missouri in *Morrow v. Surber*, 97 Mo. 155 (11 S. W. 48). There a warrant not yet due and payable, because there were prior warrants outstanding and unpaid, was presented to the deputy county treasurer and by him paid, under the belief that it was in fact payable. The treasurer brought an action against the payee to recover the money paid thereon, and tendered to him the canceled warrant, and the court sustained the action, notwithstanding the claim of the defendant that the warrant had been fully and properly paid. In *Elser v. City of Ft. Worth*, 27 S. W. 739, it was proposed to purchase a certain series of city bonds with money in the hands of the treasurer which had been collected for the purpose of redeeming another series of bonds, and it was contended that the investment of the money as proposed by the city council would work a cancellation and extinguishment of the bonds so purchased. But the court ruled otherwise. And in support of its conclusion the court quoted from Jones, Corporate Bonds and Mortgages, § 325, where it is said:

" A company may purchase its own bonds as an invest-

ment, and re-issue them. If the facts show that there was no intention of paying the bonds, but they were regarded and reported by the company as still outstanding, they are valid in the hands of a subsequent purchaser and are secured by the lien of the mortgage."

From the above cases, it appears that something more may be necessary to constitute payment on the part of municipal, or other public corporations, than the delivery to the holder of its warrants or other obligations of the amount of money evidenced thereby, and that the intention of the obligor is important in determining the question whether the obligations have or have not been extinguished. Other authorities expressly announce the doctrine that upon the question of payment the intent or purpose of the parties to the transaction is not to be disregarded. In 18 Am. & Eng. Enc. Law, p. 150, it is said:

"Payment is a mode of extinguishing obligations. It is an act calling for the exercise of will, of consent. To constitute a payment, money or some other valuable thing must be delivered by the debtor to the creditor for the purpose of extinguishing the debt, and the creditor must receive it for the same purpose."

In *Cushing v. Wyman*, 44 Me. 121, it was held that

"To enable a party to set up the defense of payment, there must be the concurring intention of the party making and the party receiving the payment. The payment must be received as well as made in satisfaction of the debt."

And in *Bloodworth v. Jacobs*, 2 La. An. 24, the court said:

"By the term payment is meant not only the delivery of a sum of money, but the performance of an obligation. . . . It is an act requiring the exercise of the will— of consent, without which it has not the characteristics of that mode of extinguishing obligations."

And Daniel's definition of the term is as follows:

" By payment is meant the discharge of a contract to pay
money by giving to the party entitled to receive it, the
amount agreed to be paid by one of the parties who entered
into the agreement. Payment is not a contract. It is the
discharge of a contract in which the party of the first part
has a right to demand payment, and the party of the second
part has a right to make payment." 2 Daniel, Negotiable
Instruments (4th ed.), § 1221.

It would seem, therefore, according to these authorities,
that the real intention of treasurer Boggs in cashing these
warrants should be taken into consideration in determining
the validity of the respondent's defense of payment, unless,
as claimed by respondent, the acts of the treasurer operated
to extinguish them, as mere matter of law; and we do
not think they did. The official books of the city clearly
show that at the time these warrants were taken up by the
treasurer there were other warrants of the city outstanding
and unpaid in amounts largely in excess of the money in
the hands of the treasurer belonging to the general fund,
and this, notwithstanding it appeared that, within the
period of time during which these warrants were issued and
disposed of, large sums of money were received from taxes
and licenses and credited to the city. It is contended by the
appellant that, at the time the transactions in question oc-
curred, all warrants of the city were payable in the order of
their issuance. On the other hand, it is the contention of
the respondent that no time was fixed either by ordinance
or the city charter as to the order of payment of warrants,
for the alleged reason that ordinance 29 of the city was re-
pealed by section 58 of the charter of 1886 (Laws 1885-6,
p. 205), which latter charter was repealed by that of 1890,
which contains no provision on this subject. But which-
ever of these positions is the correct one, is immaterial, so
far as this case is concerned, for, under the law of this state

as established by the decision of this court in *La France Fire Engine Co. v. Davis*, 9 Wash. 600 (38 Pac. 154), and other cases, warrants like these are payable, in the absence of legislative direction, either in the order of their issuance, or of their presentation, and not at the discretion of the particular officer whose duty it is to pay them. And that being true, it follows that the city treasurer had no authority to pay these warrants when they were originally presented to him, nor did the holder at that time have a right to demand payment. We think it fair to presume that treasurer Boggs was aware of that fact, and for that reason carried the warrants which he received in lieu of cash, and refrained from crediting himself with the money so paid out. This practice of the treasurer of taking in warrants and then considering them as money until disposed of for cash prevailed for nearly four years—one witness says even longer than that—and yet neither the treasurer nor any other city official charged with the duty of looking after its financial affairs ever considered the warrants as paid. A careful examination of the whole evidence discloses that the city council must have known of the treasurer's custom of dealing with warrants, for its financial committee knew it, according to the testimony of its chairman, and so did the comptroller, as the testimony of the deputy shows. The knowledge of these officials was knowledge of the city. And with this knowledge on their part all of these officials acquiesced in the acts of the treasurer here complained of. But it is, in effect, argued on behalf of the respondent that this acquiescence on the part of the city officials was in furtherance of a scheme or conspiracy between them and the treasurer and certain banks and warrant-brokers to swindle and defraud the city. If the evidence disclosed such a state of facts it would be difficult for us to find language sufficient to express our utter abhorrence and con-

demnation of such conduct. But we fail to discover proof of any such thing. Whatever may have been the motive actuating the treasurer and other officials of the city, it does not appear that it was to defraud the city, for the proof shows that, for every one of the warrants disposed of by the treasurer, cash equal to its face value was received to the credit of the fund on which it was drawn. That the acts of the treasurer respecting these warrants were irregular and reprehensible is not disputed, but that they amounted to a payment and extinguishment of the warrants is quite a different proposition. Whatever may be the true definition of the word " payment," one thing, we think, is absolutely certain, and that is, that it cannot be said that an obligation has been paid and discharged unless the obligor has parted with money or some other thing of value for the purpose of discharging it. It follows, therefore, that, if the city's funds were left in the same condition after these transactions, in which they were before, the warrants were not paid; and such, according to the evidence, is the fact in this case. It is true that it is not shown that when any particular warrant that had been taken up and carried as cash by the treasurer was disposed of, the amount received therefor was either credited to the city or charged to himself by the treasurer, but the same result was accomplished by letting the cash account stand as if no such transaction had taken place. A debit and a credit of the same amount would evidently have left the account as it was before. It is admitted, or rather stated, by the learned counsel for the respondent, in their brief on rehearing, that the evidence shows exactly what money went into the hands of the city treasurer and with what he was charged with having, and from whence it came, and that the money in his hands was received for taxes and licenses and from the sale of bonds, and was checked every morning by the deputy comptroller

from the treasurer's books. And this statement is amply corroborated by the evidence in the case. Now this " checking up " of the treasurer's accounts by the comptroller was done in pursuance of a provision of the city charter, so that his books, as well as the books of the treasurer, would show the " exact financial condition of the city." It being true, then, that all the moneys received by the treasurer were duly credited to the city in his books, and " checked " by the comptroller, and entered in his books, it is clear that if the money paid out for warrants was not replaced by the treasurer there would have been a wide discrepancy between the books which were required by the city charter to be kept, and which were kept, by these respective officers. But there was no substantial discrepancy, for the evidence discloses that when Boggs went out of office, on or about April 17, 1894, there was a difference of but six cents between his books and those of the comptroller. And, moreover, the report of the finance committee made to, and adopted by, the city council, on January 14, 1893, which was offered in evidence by appellant, and, as we believe, wrongfully excluded by the court, shows that they had examined the books and accounts of the city treasurer and those of the comptroller, from April 19, to December 31, 1892, and found the difference between the two to be four cents, and that in other respects the accounts agreed. That report also shows that the committee had examined the checks and bank accounts, and counted the cash with the city treasurer up to said December 31, 1892. It appears by the city charter that this finance committee was not an ordinary committee appointed at the pleasure, and simply for the convenience of, the council, but that it was a distinct organization, or body, provided for, and having its duties prescribed, by the charter. This examination of the treasurer's books by the finance committee was made in

discharge of its duty, under the law by which it was created
and governed, and its report, especially after its adoption by
the council, was competent evidence to show that all the
funds of the city were then—and that was some time after
these warrants had been disposed of—in the hands of its
treasurer, and, by consequence, that the city had parted
with no money on account of these warrants.   And our
view respecting the force and relevancy, as evidence, of this
report is not, in our judgment, inconsistent with the ruling
of the court in the cases of *Dudley v. Inhabitants of
Weston*, 1 Metc. 477, and *Collins v. Inhabitants of
Dorchester*, 6 Cush. 398, cited by counsel for the respond-
ent.   It is generally understood that official books and rec-
ords, when relevant, are admissible in evidence, and, if not
impeached, constitute proof of a very satisfactory character,
as to the facts recited therein;   and accordingly both parties
here rely, to a greater or less extent, on the official books of
the comptroller and treasurer as supporting their respective
positions.   It is suggested, however, on the part of re-
spondent that the proof only shows at most that the city
treasurer, and not the city itself, received the proceeds of
warrants which were sold, and that such proof is not suffi-
cient to bind the city.   But it must be conceded that a
municipal corporation, as a distinct and separate entity,
apart from its officers, is incapable either of receiving or
disbursing money.   It can only act by and through its le-
gally constituted officers and agents.   The charter of the
city of Tacoma makes it the duty of the city treasurer to
receive and safely keep all the funds of the city, and to dis-
burse the same only on orders signed by the president of
the council, attested by the city clerk, and countersigned
by the comptroller.   When, therefore, the treasurer in his
official capacity receives money belonging to, and for the
credit of, the city, the city receives it, and it is thenceforth

the money of the city. But it is claimed by the respondent that his predecessor Boggs had no right to receive money for the particular warrants which he paid for with the public funds, and that neither he, the respondent, nor the city are bound by his acts in that regard. If that be true, then why should the city retain the money so received by its agent for its use without authority, as it is claimed, and at the same time claim that the warrants have been paid? As already indicated, the irregular and unauthorized, and, we might say, illegal, part of the warrant transactions, and which, it is claimed, the city could and did ratify, consisted in buying these undue warrants with city money. But can it be justly said that a city may ratify and confirm that part of a transaction which was wrong and repudiate that which was right, simply because it may be to its own pecuniary interest to do so? We think not. We say that the replacing of the money obtained for these warrants in the city treasury was right because we are aware of no rule of law or good morals which prevents one from returning to the rightful owner property which he has wrongfully taken from such owner. Cases are cited by respondent which hold that a city or county warrant, check, or certificate which has been once paid is thereafter *functus officio* as an evidence of indebtedness, and cannot be re-issued without competent and express authority, and, if so issued, is subject to the defense of payment, or any other legal defense, even in the hands of a *bona fide* holder. But that proposition is not disputed by the appellant. The question here is, not the effect of actual payment, but whether in fact payment has ever been made at all. And that four of the warrants were paid before they came into the hands of the appellant was just what the respondent undertook, but, in our judgment, failed, to prove at the trial, because the facts proved did not constitute a payment. Aside from

the record evidence above mentioned showing that the city received the proceeds of all the warrants which were sold, it is shown by positive oral evidence that the city, by its treasurer, received the full face value of two of these warrants when they were delivered to the assignor of the appellant. One of them was delivered to the Union Savings Bank, and the face value thereof credited to the city and the amount was subsequently paid out on the official order of the city treasurer. The other was delivered to the same bank and was paid for by a check drawn to the order of Boggs, as city treasurer, which check was paid in the usual course of business.

It is further contended by the respondent that the depositing of the city funds in the banks of the city was an illegal act and violative of section 7 of article 8, and sections 14 and 15, of article 11, of the state constitution. The first section referred to prohibits a municipal, or other public corporation, from giving any money or property, or loaning its money or credit, to, or in aid of, any individual, association, company or corporation, except for the necessary support of the poor and infirm, etc., and the second makes it a felony for any officer having the possession or control of any public money to make a profit out of the same or to use it for any purpose not authorized by law. The third section cited has no appreciable bearing upon the questions involved herein. It is not contended here that the city of Tacoma ever loaned either its money or credit to any bank, and therefore the first section of the constitution above cited has no application to this case. While under the constitution and statutes of this state it would be illegal and criminal for a city treasurer to make a profit by loaning or otherwise using contrary to law the public funds intrusted to his keeping, we do not think that depositing such funds in a bank, simply for safe-keeping,

subject to re-payment on demand, is in any respect illegal. It is neither a loan nor an investment of the funds, in the ordinary meaning of these words, as used in constitutions and statutes like ours. See *Comstock v. Gage*, 91 Ill. 328; *Moulton v. McLean*, 5 Colo. App. 454 (39 Pac. 78); *Estate of Law*, 14 L. R. A. 103 (22 Atl. 831); *In re House Resolution*, 12 Colo. 395 (21 Pac. 486). See, also, *State v. McFetridge*, 84 Wis. 473 (54 N. W. 1).

In *Baily v. Commonwealth*, (Pa.), 10 Atl. 764, and *Nason v. Directors*, 126 Pa. St. 445 (17 Atl. 616), the right of official custodians of public funds to deposit such funds in bank does not seem to have been questioned, although the constitution of Pennsylvania as to making a profit, etc., out of public money is identical with our own. See Brightly's Purdon's Digest, p. 42.

Of course the liability of the treasurer for all money of the city coming into his hands cannot be affected by his having deposited it in a bank. If it is lost in consequence of the insolvency of the bank he and his bondsmen must make good such loss. But it is scarcely necessary to say that no mere loss by a city of its funds, however it may have occurred, will operate to discharge its just liabilities.

As to the two salary warrants, we are of the opinion that, under the ruling of this court in *Taylor v. Tacoma*, 8 Wash. 174 (35 Pac. 584), they are illegal and void and constitute no ground for a mandamus against the respondent. But as to the other three warrants, the judgment is reversed and the cause remanded with directions to issue a peremptory writ of mandate commanding the respondent as treasurer of the city of Tacoma to pay the warrants described in appellant's affidavit and drawn and issued to Arkley, Bunn and Dautrick, respectively.

DUNBAR and GORDON, JJ., concur.

SCOTT, C. J., (dissenting).—The re-argument of this case orally and by additional briefs has only confirmed me in my former opinion. The closest re-examination of the record has failed to bring out any new material facts under my view of the law in favor of the appellant, but I think the case has been much emphasized against him. Owing to the great importance of some of the questions previously decided and since set aside by the majority, and having a more thorough understanding of the case, I will undertake to present the substance of it as shown by the record. Before going into the details, several matters which seem to have been given weight in the last decision of the case will be noticed.

The documentary evidence in the record which has led to the change in the decision establishes no different facts more favorable to the plaintiff than those previously considered. It must be borne in mind that at no time has it been disputed that the *official books* of the comptroller and the treasurer showed the correct amount of money received and disbursed, except that they showed nothing as to the money being paid out for certain warrants and afterwards replaced upon the negotiation of such warrants. That lists were made out and attached to these warrants and delivered from time to time with certain of them to purchasers is of no significant force. The only record kept of these lists was a letter press copy taken in a private book of the city treasurer. They were no part of the official records, but were private memoranda of the treasurer. Reference is made to the fact that when the warrants were presented the payee was required to indorse his name on the back thereof, the warrants being payable to the order of such person, and evidently some importance is attached to this, but it clearly has no bearing upon the question of payment, for that is a general custom where warrants are paid by public treasurers

to *stay* paid. When a warrant is presented for pay
ment and is indorsed "not paid for want of funds" and
returned to the holder, his indorsement is not required, but
when it is paid, either then or afterwards, he is required
to write his name on the back of the warrant, it being in
the nature of a receipt. Neither does it tend to show an
intention on the part of the treasurer not to pay them at
the time, but rather the reverse, if his private or secret in-
tention was of any consequence. The testimony shows that
this custom was simply observed here for some of these war-
rants so required to be indorsed were turned in by him to
the comptroller as canceled. They were not all sold by
him. There were a few exceptions also to his custom of
giving the money to the holder when they were presented.
In some instances they were indorsed "not paid for want of
funds" and returned to the holder. (Testimony of deputy
treasurer, top pp. 23 and 24.)

It cannot be assumed that the city has not been injured
if it got back the exact amount of money paid by Mr.
Boggs for the warrants. It appears that this warrant deal-
ing extended over a period of several years and warrants
representing a large amount of money—$600,000 as is
given approximately by Mr. Armstrong, the deputy treas-
urer, at p. 31—were so handled. It also appears by certain
ordinances that they bore interest at the legal rate, which
was at that time ten per cent., where no rate was specified
in the instrument. It also appears by the books that dur-
ing this time the city had on hand varying, but large,
amounts of money, to-wit: July 31, 1892, $132,530.49;
August 31, 1892, $231,352.97; September 30, 1892,
$243,638.20, in the general fund. (Pp. 68 and 69.) It
also had other money in other funds. By the use of this
money for the purpose of speculating in warrants, thereby
keeping them afloat as interest bearing for the benefit of

private parties, the city was deprived of its use in taking up outstanding obligations. These warrants were eagerly sought for, as it appears by testimony hereafter given that parties were willing to pay a commission to obtain them in addition to their face value, and wanted all they could get. This commission went to Mr. Boggs. How much it amounted to is not shown. But that, together with the interest upon the city's money, was sufficient to create a large corruption fund. Mr. Boggs had control of the situation. No one else could compete against him, for his indorsement was required to make these warrants interest bearing, and he was a valuable man to have. The ordinary holder would be likely to know nothing of the condition of the funds, and, if the money was offered to him on presentment of the warrant, he would take it. It is not certain he would have the right to refuse city money offered in payment on presentment of a warrant, conceding there was none applicable to the payment of the particular warrant when it was presented. The exceptional cases where warrants were indorsed and returned to the holder may have been where they were presented by parties who did know something of the state of the funds. I see no reason why Mr. Bogg's intention with regard to payment should have any more weight than the intention of the party presenting the warrant. When he presented his claim for payment or indorsement, if he had known it was not being paid but that he was merely being handed the amount it called for, he might have objected. Possibly he might have wanted an investment himself, or, at least, the commission.

Briefly, what are the matters here in issue? The substance of the contention is twofold. It presents two distinct phases as affecting the city, first, loss by way of interest, as aforesaid, and second, some contention as to loss of principal. While the amount in controversy in this action is

small, the questions involved affect many thousands of dollars, and the whole manner pursued by Mr. Boggs in dealing with the city's obligations and funds is pretty thoroughly aired in the trial of this action, which was evidently brought in the nature of a test case.

But now as to the second phase of the contention. Here the record is somewhat confused, and also the briefs as to the exact contention of the defendant. A willingness is expressed on behalf of the city, although it is not a direct party, at least, to this action, to return all of such moneys that the city actually got. It seems to be contended that it is incumbent on the plaintiff, or claimant, to show that the money paid for these warrants upon their re-issuance was thereafter actually used in discharging some valid city obligation, or was turned over by the treasurer to his successor in office; that, if it was simply carried on bank books as a city credit and was eventually lost as is intimated or assumed, that would not be sufficient.

On the trial of the cause the defendant assumed the burden of showing that these particular warrants (with the exception of one salary warrant) had once been paid or taken up by the treasurer with city funds, and had been subsequently sold by him to other parties. The plaintiff undertook to show that the money had been replaced in the city funds when the warrants were re-issued, and was actually in the funds during the times in controversy. Entertaining a radically different opinion, both formerly and now, as to what the record shows from that expressed by the majority, it will be necessary to quote some of the testimony of the deputy comptroller, Mr. Geo. McD. Arkley, and that given by Mr. Gove, the chairman of the finance committee, as this seems to be the particular testimony mostly relied upon. This in part with reference to the moneys being returned, and being on hand in the city funds, and also as

to the difference of opinion existing as to the knowledge shown of the other city officers respecting Mr. Boggs' practice of selling warrants, if that is a material fact. It was said by me in my former opinion that there was nothing to show that any of the city officers aside from the treasurer knew the facts in relation to his thus taking up and re-issuing warrants. It was understood then that some of his assistants knew it, but they could not lend the matter any additional strength; but the statement is not strictly accurate, for it appears that one other officer, Mr. Arkley, the deputy comptroller, knew of it, as his testimony hereafter given discloses. I still contend respectfully that it does not appear that Mr. Gove, the chairman of the finance committee, knew it, and to substantiate this his testimony will be given in full. I do not understand it to be contended that it appears elsewhere than in his own testimony.

Of course, what the official books of the comptroller and of the treasurer show that he should have on hand in money is one thing, and what he actually did have is another. Now, conceding that the official books balanced and were correct, what is the proof relied upon going to show what he in fact did have? Mr. Arkley was called by the plaintiff. His testimony relating to the comptroller's accounts with the treasurer and his knowledge of the treasurer's doings is too long to be given in full; some of it is not relevant and there are many repetitions. The following extracts are given to show its substance:

"PAGE 74.　ON DIRECT EXAMINATION.

Q.—Mr. Arkley, whose business was it in the controller's office to check up the treasurer's office daily as was testified here was done?

A.—Mine.

Q.—In doing that checking up what items did you charge the treasurer and with what items did you credit him?

A.—I charged him from the stubs of the receipt books.

I charged him with everything he collected, and we gave him credit for the vouchers he presented marked paid on the dates on which they were paid.

Q.—During the year 1892 was any credit given the treasurer on the controller's books for payment of any warrants excepting those that were marked canceled and paid?

A.—No.

"PAGE 76.   ON CROSS–EXAMINATION.

Q.—As a matter of fact there were a large number of warrants cashed by him were there not, and which were not turned in and canceled and which he afterwards re-issued?

A.—Yes.

Q.—Now, according to your statement I believe that you said that the outstanding warrants at that time (July 31, 1892) on the general fund was $419,668.17?

A.—Yes.

Q.—Now, do you know how many of those warrants had been cashed by the treasurer and afterwards re-issued by him?

A.—No, I don't know that.

Q.—All such warrants as he had cashed and had re-issued and which he had not turned over are included in that sum as outstanding, are they not?

A.—Well, I presume that is—you put your question in a very strange way.

Q.—Well, if there were any warrants that he cashed and re-issued instead of cancelling them they would be included in this?

A.—Without a question.

Q.—In this amount?

A.—Yes, sir.

Q.—And the same would be true of each of the other amounts would it not?

A.—Certainly. I could have no knowledge of them unless he canceled them and turned them over to me as paid warrants—couldn't possibly have it.

Q.—Now, as a matter of fact, Mr. Arkley, was it not true that a large amount of these warrants, these four hundred

and nineteen thousand dollars worth, had as a matter of fact been cashed by the treasurer?

A.—Well, now how am I going to answer that question? How do I know?

Q.—Well, you know that some of them had, do you not?

A.—I don't know.

Q.—You checked him up on them?

A.—Now, I know I know a whole lot of things, but when it comes down to being evidence in a court I don't know them.

Q.—Well, now from your checking up of the treasurer's office there—you were in there every day, were you not?

A.—Yes, sir, every day.

Q.—Now, don't you know as a matter of fact that he used to cash warrants as they were presented there right after they were issued?

A.—Yes, I know that, because I saw it done.

Q.—Now, don't you know that those warrants are included in these warrants that you state are outstanding?

A.—Well—

The Court.—You seem to make a distinction between what you know—as deputy controller was it?

Witness.—Yes, sir.

The Court.—And what you know as an individual; but these questions do not go to that. You answer the questions from what you actually know, no matter where you received the information.

Q.—Now, have you any doubt—take this four hundred and nineteen thousand dollars in this statement of July 31st—have you any doubt that a large part of that four hundred and nineteen thousand dollars had been cashed by the treasurer?

A.—That the treasurer passed the money over the counter in exchange for those warrants?

Q.—Yes.

A.—I have not any doubt about it—not the slightest doubt.

"ON RE—DIRECT EXAMINATION.

Q.—Mr. Arkley, in making your daily checkings in the treasurer's office did you or did you not find any unindorsed

warrants in the till or in the safe in the treasurer's office?

A.—I had nothing to do with what the treasurer had in the safe, not a thing whatever. All my duty consisted of was in charging him up with the amount of his receipts, and giving him credit for the vouchers that he represented paid, marked paid; what there was in the safe or what there was not in the safe did not come within my official cognizance whatever.

## " ON RE–CROSS EXAMINATION.

Q.—What other information did you get from the treasurer?

A.—Then I got from the treasurer—if there was a pressure of business, I got from him the daily amount of his disbursements if there was a great number; if the disbursements were very small why I might let them run for three or four days and sometimes they run right through to the end of the month, but whether it were daily or whether it were semi-weekly or whether it were at the end of the month we got the original vouchers from him and I took a minute of all he had paid on these different vouchers, distinguishing the record by the fund it was paid on, whether it was warrants or refund of license or whatever it might have been, and I put my own initials on every one of those things when I took the detail off, always seeing the date that they were marked paid, and from that I made up the accounts.

Q.—Now that was the data you got from the treasurer?

A.—Yes, sir.

Q.—You got his disbursements from his own statement of them?

A.—No, I got his disbursements from the vouchers themselves—from the warrants themselves.

Q.—Such vouchers as he would show you?

A.—Certainly, what he presented me as vouchers.

Q.—And you got the receipts from the stubs of his receipt books?

A.—Yes, sir.

Q.—And those are the items that you took into the controller's office with which to make up the controller's books?

A.—Yes, sir.

Q.—And that is all there is to it?

A.—Yes, sir, that is the whole statement.

Q.—Now, what was in the safe and the paying out of money for warrants and re-issuing them, you had no account of that?

A.—No knowledge at all, sir.

Q.—Did not participate in it?

A.—No.

Q.—Permitted it to go on?

(No answer.)

"RECALLED, P. 115.    ON RE–CROSS EXAMINATION.

Q.—Now, Mr. Arkley, these statements that you testified to, I believe you say, are made up from the controller's books principally?

A.—Yes, principally from them.

Q.—Now, is it not a fact, that the controller's books merely undertake to show what the treasurer should have on hand from time to time, in accordance with the method in which they are kept? In other words, what I want to get at is this, whether the controller's books do not merely show that he ought to have so much on hand, and that he had not accounted for the balance, instead of showing what he actually had on hand?

A.—Why, all that the controller could do, under the charter or in any other way, was simply to state the amount of money that the treasurer should have.

Q.—And he might have had a less amount on hand than he ought to have had on hand and still the controller's books would not show it?

A.—He might have a less amount or a greater amount; we could only show what he ought to have had.

"BY THE COURT.

Q.—Mr. Arkley, I understand you to say, then, that the extent of your testimony is that the controller's books show what the treasurer ought to have had?

A.—The amount of money that the treasurer is owing to the city.

Q.—Without knowing, as a matter of fact, whether he did have it or not?

A.—We could not go into the safe nor into the banks to know what he had."

The testimony of Mr. Gove is given in full, more for the purpose of showing what he did not testify to than otherwise. The objections and arguments are omitted. He was the only member of the finance committee examined. His testimony is as follows:

" P. 93. Dr. Royal A. Gove, a witness for plaintiff, testified:

Q.—What is your name?

A.—Royal A. Gove.

Q.—What is your residence?

A.—Tacoma.

Q.—What, if any, official position have you ever held in the city of Tacoma?

A.—The only official position I have ever held was member of the city council.

Q.—During what years were you city councilman?

A.—From 1891 to 1895, two terms.

Q.—During 1892 upon what committees were you?

A.—I was on the finance and hospital committees. I think those were the only two.

Q.—Who was the chairman of the finance committee?

A.—I was.

Q —How long were you chairman of the finance committee?

A.—Two years.

Q.—What two years were those?

A.—The first two years I was in the council.

Q.—What was the exact time you were first elected?

A.—April 17, 1892, I think I took office if I remember right—that is right.

Q.—Then you were chairman of the finance committee from April, 1892, around to April, 1894?

A.—Yes, sir, that is right.

Q.—During that period what was done by the finance committee with reference to checking up the treasurer's office and counting his cash?

\* \* \* \* \* \* \* \* \*

A.—At different periods of time we examined the treasurer's books and his accounts, counted his cash, determined if it was the amount that the controller stated he should have.

Q.—In counting the cash did you find any warrants of the city of Tacoma unindorsed by the treasurer's indorsement, "Not paid for want of funds?"

A.—Yes, we found such warrants.

\*        \*        \*        \*        \*        \*        \*        \*        \*

Q.—In checking up the treasurer's account and counting his cash, when you found such an unindorsed warrant being carried by the treasurer as cash, did you count that as a cash item, or as a voucher for disbursements? I ask you as to the fact, what the finance committee did with regard to it.

\*        \*        \*        \*        \*        \*        \*        \*        \*

A.—We treated it as cash."

It is apparent they were counted as representing so much money the same as any other voucher would have been before being turned over to the comptroller. This witness does not even say the amounts were found to be correct; he was not called for that purpose. The report in question was offered later to show that, and was excluded. He was evidently called to show that he found uncanceled warrants in the treasurer's cash box, and that they were counted as so much cash. Now does it appear that he knew what became of these warrants thereafter? It appears by other testimony that some of them were afterwards canceled and turned over to the comptroller. The greater part were put afloat as unpaid. A subsequent examination of the cash box would not show what had been done with the warrants there at a previous examination. It does not appear that the finance committee kept any books, or lists of canceled, or uncanceled, warrants. The charter only required them to make yearly examinations. Section 42. From all that was proved they merely took the balance or amount the

comptroller's books showed the treasurer should have, and counted his cash with reference to that. Of course the amount of the canceled warrants turned in would enter into . the account making up the balance. But it does not appear that they knew anything as to any particular warrant. Now it appears that very loose practices prevailed in the treasurer's office with respect to his cash, and otherwise, aside from his varying practice as to taking up warrants on presentment, or, as he sometimes did, of indorsing them and returning them to the holders, for which no explanation is offered. As to those he took in and subsequently canceled it was not always immediately done; they were carried as cash for an indefinite time, and the testimony shows that there were other documents carried as cash; for instance, some of the employés would occasionally take money from the cash box and deposit their "I O U's" therein, drawing against their salaries. (Page 33.) To what extent this was done and how long they remained does not appear. Various other papers, such as receipts, were also carried as cash. How much money the treasurer kept in his cash box or safe does not appear, but judging from the volume of business transacted it must have averaged a considerable sum. Were these other papers also counted as cash by the finance committee? The facts relating to such important matters should be made to fully appear in order to determine whether this examination was really anything more than a sort of old time grand jury examination of public funds and records which were ordinarily made in an hour or two, and nothing found wrong. Even if all the papers alluded to were counted as cash and including them so far as the proof introduced is concerned, he might in fact have been many thousand dollars short. All of this is with reference to the theory that the burden was on the plaintiff to show that the money was actually turned into the city's funds for *these*

*warrants* when they were re-issued. There was some proof of a general practice to replace it, and that if it was not replaced the books would not have balanced, etc. But it was insufficient to show that the money was actually there. Under the theory upon which the cause was apparently tried as stated, the defendant assumed the burden of showing that these particular warrants (excepting one of the salary warrants) had been once cashed by the treasurer with the city's money. The plaintiff assumed the burden of proving that the money for these warrants had been replaced. They sought to do this by offering the report of the finance committee which, as they argue, would have established a *prima facie* case if admitted, showing it agreed with the amount the comptroller said he should have on hand. Being ruled out it was not incumbent on the defendant to go into that matter or to show that the money had not been received. No explanation is offered of the fact that the treasurer turned over considerable amounts in warrants to the comptroller as canceled. There is no showing that any system was pursued with regard to it, or that they were of a different class from those he re-issued. It does appear that many of them were on the general fund. It has not been made apparent that they were older warrants as to time of issuance or previously indorsed and entitled to payment on that ground. At least nothing of that kind has been called to our attention. But it is not very material. It has some bearing on the character of the acts of the treasurer as to their being secret or otherwise. But it was his duty under the law to pay out all the money in the general fund in discharge of warrants drawn against it in some manner. This is a matter of common knowledge. And his business methods would seem to indicate a stealthy course and a desire to conceal his doings in regard to speculating with the funds. But it could not make much difference as to the legality of

it, if it was open and aboveboard. It is true, if some of the other city officers had been attentive to their duties they might have known that the treasurer was carrying a considerable amount of money continually that he should have paid out; but the mere fact that these officers were neglectful of duty does not tend to legalize the dishonest and criminal acts of the treasurer.

I do not wish to be understood as thinking it at all important as concluding the city's rights that certain of its officers knew of the treasurer's doings to some extent in the premises. I think it was immaterial. There may have been more than one in the scheme. If Mr. Boggs wanted the city's money to speculate with, it being a felony under the laws of the state which will be more particularly referred to later, he should at least have had the express permission of the council, as a body, to do so. It does not follow that that even would have been sufficient. *Arnott v. Spokane*, 6 Wash. 442 (33 Pac. 1063); *Hackettstown v. Swackhamer*, 37 N. J. Law, 191; *Mayor v. Ray*, 19 Wall. 468.

I have discussed it because it has been relied on by the plaintiff and by the majority of the court. The court directs the cause to be remanded with directions to issue the peremptory writ commanding the defendant to pay the warrants originally issued to Arkley, Bunn and Dautrick. This ought not to follow in any event under the view there taken. One witness testified that the money for one of these warrants (B 1881)—the one issued to Dautrick—was paid to Mr. Boggs as city treasurer, or was subsequently drawn out by him as such, it is true. If this is to be held conclusive, the recovery should at this time be limited to that and the cause simply reversed, as to the warrants originally issued to Arkley and Bunn, there being no such proof as to these warrants. The other warrant that was so testified to was a salary warrant for which no recovery was allowed.

If a recovery is to be allowed on the ground that the city got the money the defendant should be allowed to show that .the city did not get it, and this after the plaintiff makes a *prima facie* case, which I do not think was done unless the report of the finance committee is treated here as in evidence. The other side should be given an opportunity to refute this. I do not think what there is here, if regarded as sufficient to make a *prima facie* case should be treated as conclusive, for it is evident the matters were not fully litigated, and it would not be controlling under my view of the law bearing on this action in any event. There is nothing in the pleadings to support the final judgment rendered. It is alleged that the treasurer has sufficient money now to pay them. The answer also alleges that the warrants were void as being in excess of the constitutional limit. This question has not been tried. The court made no findings thereon, but found against the plaintiff on another ground, and that ground only was considered upon the first trial here. What the books and exhibits would disclose as to this defense would require an extended examination, and I assume that we would not undertake to determine it here in the absence of findings by the lower court. It does not clearly appear that they were such as would not be affected by the constitutional limit. There is an exhibit in the record, purporting to be a decree in an action brought by one Murry against the city and certain of its officers, adjudging a certain class of warrants to be invalid, etc., which it is assumed has a bearing on these warrants. At the most, in the present condition of the case, the judgment should only have been reversed and the cause remanded for a re-trial, with directions to make the city a direct party.

There remains a most important question to be considered as affecting the re-issuance of these warrants. I understand it to have been conceded from the first that the parties

now holding such warrants are not entitled to any greater rights than the parties who first obtained them from the treasurer on their re-issuance; that if the subsequent holder could recover, they could, and the warrants being nonnegotiable, of course, the principle is well settled under the law. It appears that the Dautrick warrant and one of the salary warrants were disposed of by Mr. Boggs with a number of others to the Union Savings Bank and Trust Company, in pursuance of an agreement made with one of its officers. The substance of the testimony of the bank's officer who made the arrangement with the city treasurer by which the bank obtained a considerable number of these warrants will be given. This officer was the plaintiff's witness, and this agreement is the very fountain head of the plaintiff's rights. After stating the position he held in the bank, and that he was acquainted with Mr. Boggs, the city treasurer, he was on his direct examination asked to

"Q.—State whether or not the Union Savings Bank at any time acquired any of the warrants described in what is known as the Bardsley complaint?

A.—Yes, sir.

Q.—Which ones?

A.—No. B1285, $25.00;  No. B1881, $100.00.

Q.—Just state the circumstances and the manner in which these two warrants were acquired by the Union Savings Bank—at what time, first, what date, were they acquired?

A.—B1285 was acquired September 24, 1892;  B1881 was acquired October 20, 1892.

Q.—Just state the manner and circumstances under which the Union Savings Bank acquired those warrants?

   *      *      *      *      *      *      *      *      *

A.—B1285 was included along with a number of other warrants and delivered to the bank, either by Mr. Boggs himself personally or by some man in his employ, I could not tell which. In payment of the warrant, or rather of the warrants included in the lot, we gave a check for the

41—18 WASH.

par value of the warrants. This check was cashed within the next day or two in the ordinary course of business. B1881 was deposited in the bank October 20, 1892, along with a list of other warrants, at its par value.

Q.—Deposited to whose credit?

A.—*It was deposited to the credit of the city of Tacoma.*

Q.—Was the deposit afterwards drawn out by the city of Tacoma?

A.—The deposit was afterwards drawn out—

Objection. . . .

\* \* \* \* \* \* \* \* \*

Q.—Well, in what manner was that deposit afterwards drawn out?

A.—It was drawn out by check signed by George W. Boggs, treasurer of the city of Tacoma.

Q.—Now, as to the first warrant, in what way was that paid, and to whom?

A.—A check was drawn payable to the order of George W. Boggs, city treasurer.

\* \* \* \* \* \* \* \* \*

Q.—Now I will ask you to state to the court whether or not you had at any time prior to this any arrangement or understanding with George W. Boggs in relation to warrants, and whether or not these warrants were acquired in pursuance of such arrangement, and if so, what that arrangement was?

\* \* \* \* \* \* \* \* \*

A.—I had an arrangement with Mr. Boggs whereby he agreed to purchase warrants for us. This arrangement was made prior to the purchase of these warrants. It was distinctly understood and agreed between Mr. Boggs and myself—

Interrupted by objection. . . .

A. (continued.)—I told Mr. Boggs we would take from him all the warrants issued by the city of Tacoma he might purchase for us. I further told him that we would advance the money, furnish him with the money to secure the warrants if necessary. Mr. Boggs agreed he would do this, and I then suggested that probably it would be better for him to

have some man in his office purchase these warrants for us. I told Mr. Boggs I did not desire him to use any city funds for us. It was a personal arrangement between Mr. Boggs he had his own funds. I did not furnish him money in advance to purchase these warrants, as they were delivered.

Q.—Did you always pay at par?

A.—We always paid at par. *We gave Mr. Boggs a commission in some instances,* not in all, but in some instances we gave him a commission for purchasing these warrants for us. It was a personal arrangement between Mr. Boggs and us, it being understood he would act as our agent in securing these warrants.

\*     \*     \*     \*     \*     \*     \*     \*     \*

The Court.—He agreed to act as your agent, did he?

Witness.—He agreed to act as our agent in purchasing these warrants for us, or have some one in his office do it.

Q.—Was this commission in addition to par paid for the warrants?

A.—The commission was in addition to par. We never purchased a city of Tacoma warrant at a discount.

\*     \*     \*     \*     \*     \*     \*     \*     \*

Q.—Now, *I believe that you stated that you never furnished him any money beforehand to buy warrants with?*

A.—*No.*

Q.—Never in any instance did you do that, did you?

A.—Not in the nature that we delivered over the actual money to him prior to the delivery of the warrants.

Q.—Well, that is what I am talking about—whether you delivered over money to him prior to the delivery of the warrants. Did you or did you not?

A.—I have already answered that.

Q.—You did not?

A.—I did not.

Q.—You knew, did you not, of the practice of cashing warrants there with city money by Mr. Boggs?

A.—I knew he cashed warrants.

Q.—Did you not know that it was with city money?

A.—Not as a matter of fact.

Q.—You did not know that?

A.—I did not. I had no means of ascertaining.

Q.—*Now, you knew that when he sold warrants to you he placed the money to the credit of the city, did you not?*

A.—*I know he did.*

Q.—Or to the credit of that account that you call the city account?

A.—That is correct; I am aware of it.

Q.—That account was kept in what name?

A.—The name of the city of Tacoma.

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

Q.—How were the checks signed which you honored on that account?

A.—My recollection is, " City of Tacoma, by George W. Boggs, city treasurer."

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

Q.—Now, how largely during the year 1892 were you engaged in dealing in city warrants?

A.—Oh, quite largely, I could not give you the amount.

Q.—Now, how much, or about how much of the city warrants you dealt in in round numbers did you procure from Mr. Boggs?

A.—I think we procured nearly all we obtained in 1892 under this arrangement.

Q.—You procured them from him at any rate, did you?

A.—We either procured them from him, or from some man in his office. They were frequently brought to us by some man in his office.

Q.—And you had no knowledge and nothing to put you on notice, I understand you to say, that he was using the city funds to cash these warrants?

A.—I did not know he was.

Q.—You did not know whether he was or not?

A.—I may have had an idea, but I knew nothing in a way that I could swear positively that I did know.

Q.—Now, what was your idea as to that, was it that he was using city money to cash them with, or that he was not using city money?

A.—*I sometimes thought he probably was using city money;* at other times I thought he was not. He told me that he was not, that he had money of his own, that he frequently had money belonging to other people.

Q.—When was that that he told you that? When did he tell you that—at this conversation that you have referred to?

A.—I do not recall the exact date, I could not tell you.

Q.—Was it more than once he told you that?

A.—I could not tell you that either. It is only a hazy recollection of the whole matter.

Q.—At this time that you had the conversation in the bank, who was present besides you and Mr. Boggs—anybody?

A.—I think no one was present excepting the two of us."

Section 57 of the Penal Code (vol. 2, Hill's Code, Bal. Code, § 7123) provides that if a public officer, including a city treasurer, shall use any of the money entrusted to him for safe-keeping in order to make a profit out of the same he shall be deemed guilty of a felony. Under this statute a number of convictions have been had and affirmed in this court, one of them being in the case of *State v. Boggs*, the treasurer here in question. (16 Wash. 143, 47 Pac. 417.) It is true that in that case he was charged with receiving interest upon public moneys. But suppose he had been charged with using the public money for speculation and had received his profit by way of a commission instead of interest, would there have been any difference in law? An information founded on this very transaction would seem well founded. Other cases are those of the *State v. Isensee*, 12 Wash. 254 (40 Pac. 985); *State v. Downing*, 15 Wash. 413 (46 Pac. 646); and *State v. Krug*, 12 Wash. 288 (41 Pac. 126), where the indictment in general terms charged the use of public money for the purpose of making a profit. A later decision is that of *State v. McCauley*, 17 Wash. 88 (49 Pac. 221). This statute, sustained in so many cases, makes it a felony for a public officer, like the treasurer of a city, to use the money intrusted to him belonging to the public for the purpose of making a profit. A

profit can as well be made by receiving a commission as
by receiving interest. Now it appears from the testimony
of the plaintiff's witness in this case that Boggs did receive
a profit in using the money of the city of Tacoma to buy
warrants to turn over to the bank in question, and conse-
quently he was brought directly within the terms of this
statute. Conceding this witness did not know of this stat-
ute, and it is only fair to assume that he did not, and al-
though this bank repaid all city deposits in full, as it is
stated that it did do, these matters cannot affect the valid-
ity of such agreements. By this testimony it appears that
the treasurer was given a commission, at least in some in-
stances, for handling these warrants in this way. As to how
he was paid for handling the others, does not appear, nor is
it material. It is evident that he was paid in some way for
his corrupt practices with reference to all of these warrants.
As far as this bank is concerned, it appears by other testi-
mony of this witness that it was all done under one agree-
ment. It conclusively appears that he was handling them
with the city's money, although there was apparently some
attempt or desire not to disclose a knowledge of that. But
it stands out in bold relief, for it is admitted that the city's
account was credited with the deposits when warrants were
turned into the bank. If it was Mr. Bogg's money that was
being used, why was the city given credit? Why was the
check given to him as city treasurer? This witness was called
by the plaintiff to lay the very cornerstone of his structure
—to show that the money of some of these warrants upon
their re-issuance went into the city fund. Now he did use
the city money. It was known that he was using it. The
bank had direct knowledge of it. No attempt to evade this
can weaken the fact, and no room is left for doubt but that
it was a part of these arrangements that he should use it.
The acts proven are conclusive. The general practice

seemed to be the same. But the proof as to this bank is clear. The testimony of this witness is not contradicted in this matter. When warrants were delivered to the bank the city was invariably given credit for the amount as a deposit, or a check was given Mr. Boggs—not in his private capacity, but as city treasurer—and this was the plaintiff's showing. If an arrangement of that kind could then be entered into and enforced, it can yet be done, and a most dangerous state of affairs exists if it is understood that such arrangements can be virtually upheld in the courts to the jeopardy of public interests. What is it but enforcing the agreement where the parties are given the benefit of the entire substance of the contract? The profit to be derived by the bank and subsequent holders was in getting the interest upon these obligations, resulting in a direct loss to the city to the extent of its idle money, for the use of which private parties were getting the benefit. The amount of this loss, while not directly shown, is apparently large, considering the magnitude of the transactions and the length of time such practices were indulged in. It would pass considerably beyond the hundred thousand dollar mark. It is apparent that the city's money was largely represented in bank credits as a deposit by the treasurer; that these credits were obtained by a deposit of these warrants upon their re-issuance. The method pursued was a very simple one. By it the city was paying ten per cent. upon its idle moneys for the privilege of depositing them. If the principal became ultimately lost the hardship was that much greater, and it is directly traceable to this practice of dealing in warrants for the benefit of the treasurer, and the parties for whom he was re-issuing them. As to how long such warrants were carried by the bank is not shown nor how much above par was received for them when they were sold to other parties, as was sometimes done. The arrangement was apparently a profitable one.

It seems clear that the result of this decision is to say that while an agreement or contract may be so heinous as to warrant a conviction of the treasurer for a felony, if carried out, it is yet not so bad but that it may be the foundation for a recovery in a civil action. If there is any authority to sustain such a proposition, it is sufficient to say that it has not been cited.

On the previous hearing it was assumed that there was no statute preventing a city treasurer from dealing in city warrants. On that theory it was argued by the appellant that such authorities as *McConnell v. Simpson*, 36 Fed. 750, did not apply to this case. But there *was* a statute —the one making it a felony—prohibiting the city treasurer from speculating in the city's warrants with the *city's money*. This seems to have been overlooked by the defendant's attorneys, and has developed in the later and more complete examination of the case.

The authorities against the validity of such agreements are too numerous to undertake to cite. The general rule will be given. The result of this case is to run directly contrary to them, or section 57 must be overturned in so far as it makes it a crime for a public officer to make a profit on public money, and Krug, Boggs, McCauley and those who were convicted of making a profit only thereon, and not for an embezzlement of the funds, were wrongfully convicted. There should not be a more lax rule recognized in a civil case than would obtain in a criminal one. The difference, if any, should be the other way. This principle is recognized where contracts contrary to public policy will not be enforced, nor rights founded thereon, even though no crime has been committed, nor statute violated in entering into it. In *Boyd v. Cochrane, ante,* p. 281 (51 Pac. 383), where an agreement was entered into to extend the time of a note in consideration of securing a deposit of

public money for a certain time, although the agreement had been executed and the bank had the benefit of the deposit for the time specified, this court refused to recognize it to the extent of releasing a surety even, holding the agreement to extend void as against public policy. The court said in that case:

"The losses which so frequently occur to counties and other municipalities in this state are nearly always attributable to the action of the custodian of the funds in keeping them on hand after they should have been paid out on warrants and demands which were due."

Rule 279, Greenhood on Public Policy, was quoted:

"Any contract by which public office is to be used for private gain is void."

The following was said with reference to Mr. Pomeroy's work:

"Mr. Pomeroy, in his work on Equity Jurisprudence, in discussing this question, places first, under the ban of the law, contracts made for the purpose of unduly controlling or affecting official conduct, and says (section 935): 'All agreements directly or indirectly preventing or controlling the due administration of justice are opposed to the universal and most elementary principles of public policy. Whatever be their form and immediate purpose, and however innocent may be the motives of the parties, they are plainly invalid.'"

Bishop on Contracts was quoted as follows:

"The rule is thus announced by Bish. Cont. § 500: 'Any contract between an officer and a private person by which the former undertakes to do anything of official duty, right or wrong, in accord with such duty or contrary to it, is in a greater or less degree an obstruction to the unbiased exercise of his office, even where it does not influence him corruptly. Therefore, it is void.'"

The court also said that:

"If there were no authorities upon this proposition, as a

matter of first impression it would seem to us that the defense pleaded here shows a contract in violation of public policy, and is void."

The case received the unanimous support of this court, and I am unable to distinguish between the principle involved there and here. There does not seem to be even a conflict in the authorities therein, and under it there could be no recovery of the principal even as to these warrants. The return of that would be a matter of grace only, if it was shown that the city had the benefit of it, and saw fit to return it. In any event, there should be no recovery allowed for any interest upon these re-issued warrants. In the later discussion of the case the question of practice has been lost sight of, the action being one in mandamus against the city treasurer only. It is a question whether under the authorities a partial relief could be given where it is not shown that the relator is not entitled to all that he demanded. But that, of course, does not go to the substance of the rights of the parties in the premises, and the whole matter seems to have been in a measure gone into on the trial.

REAVIS, J.—I join in the dissenting opinion of Judge SCOTT.

## ON PETITION FOR RE-HEARING.

ANDERS, J.—The respondent has filed a petition for a re-hearing in this case, on the sole ground, as alleged, that it appears from the opinion lately filed herein, that the decision of the court was based upon the report of the finance committee of the city of Tacoma (alluded to in said opinion), which was offered in evidence at the trial below and excluded on the ground, as stated in the petition, of incompetency. And it is alleged by the learned counsel for the petitioner, that it was improper to determine the rights of the respondent and of the tax payers of the city upon evidence *dehors* the record. From the standpoint of counsel

it must be conceded that their conclusion is eminently correct, but the premise from which it is drawn is false, as matter of fact. Error was predicated upon the ruling of the court in excluding this report, and it was, therefore, deemed incumbent upon the court to determine the question thus presented; and it was merely intended by what was said in respect thereto to show, first, what the report was, and, second, why it was in our opinion relevant and competent evidence. The language employed by way of argument was, perhaps, not as felicitous as it might have been, but it is not true that the report of the finance committee was treated as evidence in the case, or that the conclusion of the court was in any way influenced thereby. On the contrary, the case was decided solely upon the evidence admitted and considered by the court below and preserved in the record. Had that report constituted the basis of the decision, the cause would certainly have been remanded for a new trial.

The petition must be denied.

GORDON and DUNBAR, JJ., concur.