[No. 3742.   Decided April 24, 1901.]

FRANCIS B. MUHLENBERG, *Appellant,* v. CITY OF TACOMA *et al., Defendants,* S. R. BALKWILL, *Respondent.*

PLEDGES — FORECLOSURE — PARTIES — RIGHT OF INTERVENTION.

Under Bal. Code, § 4846, which provides that "any person may, before the trial, intervene in an action or proceeding who has an interest in the matter in litigation, in the success of either party, or an interest against both," the receiver of an insolvent bank is entitled to intervene in an action by the trustee of a pledgee of such insolvent bank, instituted for the purpose of establishing the validity of certain city warrants, which were the subject of the pledge, and which, the receiver claims, had been fraudulently and collusively sold by the pledgee to itself; and the fact that the bank, or its receiver, has another legal remedy for the enforcement of its claims is immaterial, under the terms of said statute.

SAME — TENDER OF INDEBTEDNESS.

Where a pledgor intervenes in an action brought by the pledgee to enforce collection of the collaterals which were the subject of pledge, tender of payment of the amount due from the pledgor is unnecessary, when it does not seek to regain possession of the pledged property, but merely to have the validity of its title adjudged as against the plaintiff and defendant in the action.

SAME — LACHES.

The fact that the receiver of an insolvent pledgor of collaterals which had been fraudulently sold by the pledgee to itself

made no move to have the sale declared invalid, until his inter-
vention some two years later in an action brought by the pledgee
as absolute owner to enforce payment of the collaterals, would
not constitute him guilty of laches, when it appears that the
pledgee had filed its claim for the debt with him as receiver
and never modified same, that the president of the pledgee bank
had admitted to the receiver's attorney a year after the alleged
sale that they would be satisfied with their claim and interest,
that in all the correspondence between the receiver and pledgee
the former always treated the collaterals as still in pledge, and
the pledgee had made no opposition thereto nor set up any claim
of title adverse to the receiver, until a short time prior to the
suit, in which the receiver promptly intervened for the purpose
of having the sale set aside and the holder of the collaterals
declared a trustee charged with the payment to the receiver of
any surplus in the proceeds of the collaterals after the satisfac-
tion of the pledgor's indebtedness to the pledgee.

SAME — PURCHASE BY PLEDGEE — WHEN SALE INVALID.

Where the pledgee of collaterals, for the purpose of acquiring
title thereto for its own advantage, and not for the purpose of
liquidating the pledgor's indebtedness, procures a sale of the
pledged property to itself, knowing that the pledgor had no other
means of satisfying its claim, and that the collateral had no
market value, but under certain contingencies would be worth
twice the amount of the debt it was given to secure, the sale
is invalid.

Appeal from Superior Court, Pierce County.—Hon.
THOMAS CARROLL, Judge.  Affirmed.

*John A. Shackleford,* for appellant.

*John D. Fletcher,* for respondent.

The opinion of the court was delivered by

WHITE, J.—The original action in which this inter-
vention was filed was begun May 27, 1898, by Francis B.
Muhlenberg against the city of Tacoma and its treasurer.
A large number of warrants were assigned to Muhlen-
berg for the purpose of enabling him to bring the action.
In his complaint he asked that the warrants held by him
be declared to be valid obligations of the city of Tacoma,

and that the city and its treasurer be enjoined from using
the revenues of the city arising from taxes, licenses, and
fines for payment of debts of the city contracted since the
issuance of the warrants held by him.   The defendants
answered that the warrants held by the plaintiff had been
paid, and that they were void.   On June 15, 1898, S. R.
Balkwill, receiver of the German-American Safe Deposit
& Savings Bank, procured leave and filed a complaint in
intervention.   This intervening complaint alleged that on
October 31, 1895, the German-American Safe Deposit &
Savings Bank was the owner of about $30,000 of Tacoma
city warrants, and that it then pledged said warrants to
the Independence National Bank of Philadelphia as se-
curity for an indebtedness of $18,000 ; that the Independ-
ence National Bank filed a creditor's claim with the in-
tervenor, as receiver, for $18,229.46, which claim was
allowed; that the Independence National Bank claimed
to be the owner of the warrants, and refused to recognize
any interest of the intervenor in them; and that the Inde-
pendence National Bank had assigned the warrants to the
plaintiff for the sole purpose of maintaining this action.
The prayer was that the intervenor might be declared the
owner of the warrants, and subrogated to all the rights of
plaintiff in the action; and the remainder of the prayer
was the same as the one contained in the plaintiff's com-
plaint.   On October 26, 1899, the intervenor filed an
amended intervening complaint.   The first paragraph of
the amended intervening complaint sets forth the appoint-
ment of the intervenor as receiver of the German-Ameri-
can Safe Deposit & Savings Bank.   The second paragraph
alleges leave to intervene in this cause and leave to amend
the complaint in intervention.   The third paragraph al-
leges that the Independence National Bank is a corpora-
tion.   The remaining paragraphs are as follows:   That

on or about the 25th day of April, A. D. 1894, said German-American Safe Deposit & Savings Bank borrowed of said Independence National Bank of Philadelphia the sum of $25,000, and to secure payment of said sum deposited city warrants of the city of Tacoma, Pierce county, Washington, of the face value of about $30,000. That payments were made upon said loan from time to time by said German-American Safe Deposit & Savings Bank, so that the amount still remaining unpaid on said loan, at the time the receiver was appointed over said German-American Safe Deposit & Savings Bank, was the sum of $18,000. At the time the receiver was appointed as aforesaid, the city of Tacoma was denying and disputing the validity of a large number of outstanding city warrants, and, among others, the said warrants so held by said Independence National Bank of Philadelphia as collateral, and was refusing to pay any of said warrants, on the ground that the same had once been paid and were invalid. That immediately thereafter the said Independence National Bank requested, instigated, and induced the intervenor to go to great trouble and expense to procure an adjudication in the courts that the warrants aforesaid, so held as collateral by said Independence National Bank, were valid, and had not been paid. And the intervenor, by reason of the instigation and inducement on the part of said Independence National Bank, and for the purpose of protecting the interest of his trust in said warrants, did go to great trouble and expense, and did, by himself and his employees, spend several months of time, and more than $500 in money, in procuring information, and preparing evidence, and otherwise assisting the holders of said Tacoma city warrants in preparing their causes for trial; three of which causes were litigated through the supreme court of the state of Washington before the

validity of the said warrants so held as collateral was
finally determined and adjudicated in favor of the war-
rant holders. And the said Independence National Bank
never informed or notified the intervenor that it made any
claim to be the absolute owner of said warrants, or that
the intervenor's interest and equity therein had termi-
nated, until after the intervenor had incurred said ex-
pense and spent said time and labor in establishing the
validity of said warrants; and the intervenor was, dur-
ing the progress of the litigation, and at all times until
after the principal cause involving the validity of said
warrants had been decided sustaining the validity of said
warrants, permitted, allowed, and induced by said Inde-
pendence National Bank of Philadelphia to believe, and
did believe, that the trust which he represented had an
equity and interest in and was the owner of, said warrants,
subject only to the payment of said indebtedness for
which the same had been pledged; that by reason of the
foregoing the said Independence National Bank and the
said plaintiff, as its representative, are now estopped, and
ought not to be heard to claim that the intervenor is not
the owner of said warrants so pledged as collateral as
aforesaid. The intervenor further alleges: That the
said Independence National Bank, on or about the 10th
day of December, 1895, filed its claim with the intervenor
against said German-American Safe Deposit & Savings
Bank for the amount still unpaid upon said loan, with
interest, making the total amount of said claim $18,-
229.46; and that the intervenor, as receiver, approved
and allowed said claim. That, at the time intervenor was
appointed receiver, said German-American Safe Deposit
& Savings Bank had no money whatsoever, and property
of very little value, and that from the assets of said Ger-
man-American Safe Deposit & Savings Bank, other than

the warrants held by said Independence National Bank
of Philadelphia as collateral as aforesaid, it was im-
possible to realize more than the sum of $1,000, which
fact was at that time made known to said Independence
National Bank of Philadelphia.   That afterwards, to-
wit, on or about the 9th day of September, 1899, the
intervenor made and fully completed arrangements by
which he could obtain money to pay off the amount re-
maining unpaid on said loan of said Independence
National Bank of Philadelphia, and at once notified said
Independence National Bank that he was ready and will-
ing to pay said amount, and did then tender to it the full
amount remaining unpaid upon its loan, principal and
interest, and requested said Independence National
Bank, upon such payment being made, to turn over to
said receiver said warrants held by it as collateral as
aforesaid.   That thereupon said Independence National
Bank refused, and ever since has refused, to accept such
payment or to turn over the warrants, or any of them,
held by it as collateral as aforesaid; and then made a
claim, and still makes the claim, that the intervenor has
no interest, equity, right, or claim in or to said warrants,
or any part of them, but that it, the said Independence
National Bank, has become the absolute owner of said
warrants, under and by virtue of some pretended sale of
said warrants made in the city of Philadelphia on or
about the 23d day of April, 1896, at which said pre-
tended sale the said Independence National Bank claims
to have become the purchaser of all of said warrants, and
by reason thereof to be now the absolute owner and holder
of the same free and clear of any equity, interest, right,
or claim of the said German-American Safe Deposit &
Savings Bank or the intervenor.   The intervenor further
alleges:   That notice of said sale was not given to him

prior to the time the same is claimed to have been made, and he had no prior notice thereof, to enable him to protect the interests of his said trust; and at no time subsequent to said pretended sale has the intervenor been notified or informed that any such sale had been made, or what amount, if any, was realized as the proceeds of said sale; and the Independence National Bank has never receipted to the intervenor for the proceeds of said sale, has never given him any credit therefor upon the claim so filed with the intervenor, and has never withdrawn, or in any manner changed or modified, said claim for $18,-229.46. That at the time said Independence National Bank claims to have made said sale of said warrants it and its officers well knew that the intervenor had no money in his said trust with which to pay off the amount of said loan, and well knew that the validity of said warrants was disputed by the city of Tacoma; that actions were pending to test their validity and enforce the payment of said disputed warrants of the city of Tacoma, including those held by it as collateral as aforesaid; and that, if the validity of said warrants should be established, the amount still unpaid upon its loan would be at once paid; that, if said warrants were held invalid, they would have no value whatsoever, and that no sale thereof could be made at any fair or reasonable price during the pendency of said litigation. And the said Independence National Bank in making said pretended sale, if any was made, did not act in good faith for the purpose of realizing money as the proceeds of such sale to apply upon the said debt from the intervenor's trust to said bank, but, on the contrary, acted fraudulently, and with the design and intent to injure the intervenor's said trust and the creditors of the German-American Safe Deposit & Savings Bank, by making a pretended and collusive sale of said

warrants to itself, or to its own officers, for the mere purpose of cutting off the rights, equities, and claims of the intervenor therein, and thereby hinder, delay, and defraud the creditors of the intervenor's said trust. That said plaintiff Francis B. Muhlenberg has no interest whatsoever in said warrants, but is merely a nominal party representing said Independence National Bank of Philadelphia. That it is impossible for the intervenor to give an accurate and exact list of said warrants, but all of the same are included in this action, and are the property of and belong to the intervenor. That the intervenor is now able, ready, and willing to pay and does tender to the said Independence National Bank of Philadelphia, and to plaintiff herein, as its representative, the full amount, principal and interest, still unpaid upon said loan, together with any and all legitimate expenses that they, or either of them, have been put to in protecting or caring for said collateral, upon proof of the same being submitted to this court in this cause. The intervenor prayed for a decree adjudging the sale of the warrants held as collateral to be fraudulent, collusive, and void, and that the intervenor be adjudged to be the owner of the warrants in controversy, subject to the payment of the indebtedness for which the same had been pledged, together with all legitimate expenses of the pledgee, and that the Independence National Bank and the plaintiff be required to deliver the warrants to the intervenor upon the payment of said indebtedness, together with the expenses; and that the intervenor be subrogated to all the rights of the plaintiff as to said warrants. The remainder of the prayer is in accordance with the prayer contained in plaintiff's complaint, and asks that the warrants be declared to be valid, and that the defendants be enjoined from using the moneys of the city to pay indebtedness ac-

cruing since the issuance of the warrants until the warrants shall have been fully paid. A demurrer to this amended complaint in intervention was filed on November 11, 1899. The grounds stated were that the court had no jurisdiction of the person of the plaintiff; that the court had no jurisdiction of the subject-matter of the action; that the intervenor had no legal capacity to sue; that there was a defect of parties plaintiff; that there was a defect of parties defendant; that several causes of action had been improperly united; that the complaint did not state facts sufficient to constitute a cause of action; that the action had not been commenced within the time limited by law; and that the complaint did not state facts sufficient to entitle the receiver to intervene in the cause. On the same day the demurrer was heard and an order entered overruling it. The answer of the plaintiff to the amended intervening complaint was filed on the 6th day of December, 1899. It denied a number of allegations contained in the intervening complaint, and by way of affirmative defense alleged that on the 23d day of April, 1896, the Independence National Bank caused the warrants in dispute, which it held as collateral, to be sold at public sale, and that the warrants were bought in for the Independence National Bank for the sum of $5,000, which amount was credited upon the indebtedness of the pledgor; and the answer sets forth the written agreement of pledge in which the German-American Safe Deposit & Savings Bank waived any notice of sale, and consented that the pledgee might become a purchaser at the sale of the pledged property. The answer further alleged laches on the part of the receiver in attacking the sale of the collateral, and that he had waited until the collateral had risen greatly in value before taking any steps to set aside the sale of the collateral. The answer also alleges the

solvency of the Independence National Bank.   The re-
ply denies a portion of the allegations of the answer, and
restates some of the allegations of the amended complaint
in intervention.

The evidence was, in substance, as follows:  About
April 25, 1894, the German-American Safe Deposit &
Savings Bank borrowed of the Independence National
Bank of Philadelphia $25,000, and to secure the payment
thereof deposited city warrants of the city of Tacoma of
the face value of about $30,000.   On June 8, 1895,
the amount of the debt had been reduced to $18,000, and
on that day the German-American Safe Deposit & Savings
Bank executed and delivered to the Independence Na-
tional Bank a certificate of deposit for the sum of $18,000
as a token of said indebtedness.   This certificate was pay-
able on demand.   This certificate bore interest at six per
cent.   Upon the 8th day of August, 1895, the German-
American Safe Deposit & Savings Bank delivered the fol-
lowing agreement to the Independence National Bank,
towit:

"We herewith deposit with the Independence National
Bank of Philadelphia, as collateral on our certificate of
deposit No. 181, dated June 8, 1895, for $18,000, on de-
mand, $24,583.05, warrants of the city of Tacoma, Wash-
ington, which we hereby pledge, together with any that
may be pledged hereafter, to secure this or any future
obligations.  Upon default of payment of said or any other
certificate of deposit, we hereby authorize and empower
the Independence National Bank of Philadelphia, for the
purpose of liquidation of this certificate of deposit, and of
all interests or costs thereon, to sell, transfer, and deliver
the whole or any part of such security, or any additions
thereto, or substitute therefor, without any previous de-
mand, advertisement, or notice, either at brokers' board
or public or private sale, at any time or times thereafter,
with the right on the part of such holder to become the

purchaser and absolute owner thereof, free of all trusts and claims.

German-American Safe Deposit & Savings Bank.

By A. J. Weisbach, Sec'y.

Tacoma, Wash., August 8, 1895."

By mistake the amount of warrants is recited in the agreement to be $24,583.05 face value. The correct amount of warrants then held by the Independence National Bank and covered by the agreement was $27,454.80. These warrants were all issued in 1894. Interest upon the certificate was paid to the 31st day of October, 1895. On November 6, 1895, S. R. Balkwill was appointed receiver of the German-American Safe Deposit & Savings Bank, and qualified as such. On November 20, 1895, the cashier of the Independence National Bank wrote to the receiver, saying:

"We beg to notify you that we wish payment made of a certificate of deposit we hold to the amount of $18,000, of the German-American Safe Deposit & Savings Bank, secured by $27,454.80 of Tacoma warrants. Unless this amount is paid, we beg to notify you that we will proceed to sell such collateral for the account above named."

On November 29th the receiver wrote a letter, saying, among other things:

"In answer to yours of the 20th, beg to say it is impossible to take up certificate of deposit, as we have no funds. All the cash we found on taking possession of the bank was one dollar and ten cents ($1.10), and the fixtures there were of little or no value."

On December 10, 1895, the Independence National Bank sent to the receiver a statement of its claim against him. On January 30, 1896, in response to a telegram inquiring whether the receiver was making efforts to secure payment of the warrants, he answered:

"Have employed eminent counsel. Must have your assistance. Estate has no funds."

On February 3, 1896, the receiver sent a letter, stating, among other things, that all the assets of the German-American Safe Deposit & Savings Bank were not actually worth over $1,000, and that claims had been filed against it to the amount of over $90,000, and suggesting that the Independence National Bank join in a plan to employ and pay the receiver's attorney to bring suit on the warrants. On February 13th the Independence National Bank wrote, inquiring who the other parties were who would be interested in this suit, what the receiver proposed to do, and what the probable expense would be. To these questions the receiver made no response. On April 2d the receiver wrote, asking the Independence National Bank to send $132, to be paid to his attorney as fees. And on April 9th the Independence National Bank answered this letter, declining to employ the receiver's attorney. At all times from the 20th day of June, 1895, until July 1, 1899, the city of Tacoma claimed that these warrants were invalid, and the city was contesting its liability on its general fund warrants in the courts. The answer of the city treasurer in the Jordan case was filed on June 25, 1895. And on July 21, 1895, Judge Stallcup, of the superior court, had delivered an opinion in that case, holding all of the outstanding city warrants, except about $23,-000, issued in 1892, to be invalid. No interest had been paid on the loan since October 31, 1895. On April 14, 1896, the president of the Independence National Bank sent the following letter to the receiver:

"Philadelphia, April 14, 1896.
S. R. Balkwill, Esq., Receiver,
    German-American Safe Deposit & Savings Bank,
        Tacoma, Washington.
Dear Sir:—We beg to notify you that the warrants

which we hold as security for the payment of certificate of deposit issued by the German-American Safe Deposit & Savings Bank, No. 181, for $18,000, dated June 8, 1895, will be sold at public sale in this city on Thursday, the 23d instant.

Yours truly,

(Signed)      R. L. Austin, Pt."

This letter was received by the receiver about April 21, 1896, and he sent the following telegram:

"To the Independence National Bank, Philadelphia, Pennsylvania. Trust we will have no trouble with you over the warrants, as we hope to pay you in full shortly. S. R. Balkwill, Receiver."

The warrants were delivered to M. Thomas & Sons, auctioneers, to sell. The sale was advertised in a catalogue of real estate and stocks to be exposed for sale at the Philadelphia Exchange on Thursday, April 23, 1896, at twelve o'clock noon. The item of these warrants is the first one in the list contained in the catalogue. Fifteen hundred of these catalogues were circulated among the banks, trust companies, insurance companies, bankers, brokers, and capitalists of the city of Philadelphia previous to the sale. The sale of the warrants was also advertised in the Philadelphia Ledger, a newspaper of general circulation in Philadelphia, in the issues of April 21, 22 and 23, 1896. The warrants were sold in accordance with the advertisement on the 23d day of April, 1896, at the Philadelphia Exchange, for the sum of $5,000, on a bid made by George S. Crapt, a broker acting in behalf of the Independence National Bank, and his bid was the only bid made at the sale. There were at least fifty persons present at the sale. The sale was made in regard to place, time, manner, and notice in the way that is customary in Philadelphia.

On December 21, 1896, in the suit brought by Murry, a tax payer, against the city and its officials, the superior

court entered a decree holding all of the outstanding warrants of the city to be invalid. The Independence National Bank joined other warrant holders in paying the expenses of the test suit of Eidemiller against Tacoma. The Independence National Bank also joined other warrant holders in paying the expenses in the case of Bardsley against Sternberg,—a suit brought to test the validity of warrants similar to those involved here. The superior court on April 7, 1897, entered a decree in the Bardsley case holding the warrants involved to be invalid, and on June 25, 1897, this court rendered an opinion sustaining that decree. Afterwards, on rehearing, an opinion was rendered on February 18, 1898, reversing the lower court. The city still continued to contest its liability on its warrants, and the warrants in controversy here, together with many others belonging to other holders, were assigned to Francis B. Muhlenberg for collection. The Independence National Bank joined with others in paying the expenses of this Muhlenberg suit. The Independence National Bank has spent $2,745.48 in carrying on litigation on these warrants. Each of the holders who joined in the payment of the expenses of the Eidemiller, Bardsley, and Muhlenberg cases paid a sum equal to ten per cent. of the face value of the warrants held by them. Muhlenberg is a clerk in the Independence National Bank. The court below concluded as a matter of law that the Independence National Bank of Philadelphia held said warrants under its original pledge, and that Balkwill, as receiver of the German-American Safe Deposit & Savings Bank, was the legal owner of the same, and had the right to the possession of the same upon paying to said Independence National Bank of Philadelphia, or by depositing with the clerk of the court for said Independence National Bank of Philadelphia, its original debt of $18,000, and six per cent.

interest from the 31st day of October, A. D. 1895, until paid, and the sum of $2,745.48 expended by the Independence National Bank of Philadelphia in protecting the warrants and proving the validity of the same, less the costs and disbursements expended by intervenor in the intervening proceeding; and that intervenor was entitled to be subrogated to the rights of plaintiff in the decree heretofore entered in this cause in favor of plaintiff and against the city of Tacoma and its treasurer, so far as said warrants are concerned.

It is claimed that the respondent did not have the right to intervene. The warrants which were the subject-matter in litigation between the appellant and the city of Tacoma were pledged to the Independence National Bank of Philadelphia, for whom the appellant was acting as trustee in prosecuting the suit against the city. While the property was transferred as a pledge to the Independence National Bank, the legal title remained in the German-American Safe Deposit & Savings Bank, for which the respondent was receiver. Jones, Pledges, §§ 7-9. The respondent claimed, in his complaint of intervention, that the alleged sale under which the Independence National Bank of Philadelphia claimed title was not made in good faith, but was fraudulent and collusive, and for the purpose only of vesting title in the Independence National Bank, and cutting off the claims, rights, and equities of the respondent therein. If such was the case, the general property in the warrants never passed from the respondent or the German-American Safe Deposit & Savings Bank to the Independence National Bank, and the appellant would, in law, be a trustee for both the Independence National Bank and the respondent. The receiver was equally interested with the Independence National Bank in seeing that the validity of these warrants was established, and was likewise in-

terested in any judgment recovered against the city of Tacoma on the establishment of this validity. The appellant, however, claimed that the respondent had no title or interest in the warrants or in the judgment that might be recovered thereon, and he assumed to act only for the Independence National Bank, and adverse to the respondent. In suits in equity brought by a trustee or otherwise affecting trust property, the beneficiary of the trust may intervene for the purpose of protecting his interest, and particularly so when the trustee shows a disposition to act adversely to his interest. *Fidelity Trust & Safety Vault Co. v. Mobile St. Ry. Co.,* 53 Fed. 851; 11 Enc. Pl. & Pr. 500.

Our statute relevant to intervention is that:

"Any person may, before the trial, intervene in an action or proceeding, who has an interest in the matter in litigation, in the success of either party, or an interest against both. An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and the defendant. . . ." Bal. Code, § 4846.

The plaintiff had a direct interest in the matter in litigation. He was interested in seeing that the validity of the warrants was established, and that a decree was entered against the city of Tacoma requiring payment. He was interested in the success of the plaintiff in obtaining this judgment. In the distribution of the proceeds of the judgment his interest was adverse to both the plaintiff and the defendant. The section quoted does not attempt to specify what or how great the interest of the intervenor shall be in order to give a right to intervene. Any interest is sufficient.

"The fact that the intervenor may or may not protect that interest in some other way is not material. If he has an 'interest in the matter in litigation, or in the success of either of the parties,' he has a right to intervene." *Coffee v. Greenfield,* 55 Cal. 382.

After he has intervened, it is the duty of the court to dispose of the whole matter in controversy between the original plaintiff and defendant and the intervenor so that the interest of the intervenor shall be completely protected. If this was not to follow, the right to intervene would be a barren one. Hence we conclude that the respondent had a right to intervene in this action, and, if the allegations of his complaint of intervention are true, the judgment of the court must be upheld.

When the owner pledges property or choses in action for the payment of a debt, the creditor no doubt has the right to hold the pledge until the debt is paid, and the pledgor cannot recover back the pledged property until he tender, or pay, or offer to pay, the debt. This action is not primarily for the purpose of recovering back the pledged warrants. It is to determine whether the respondent is the owner of the warrants, and entitled to recover them back, upon paying the amount for which they were pledged to the Independence National Bank.

"An unlawful sale does not *per se* operate as a conversion, yet the pledgor may, at his option, so consider it, and that he may regard the contract as at an end, tender or offer to pay his debt and demand his pledge." Jones, Pledges, § 571.

The respondent in this case offers to pay his debt, but the appellant in effect says, "I will not accept it; the warrants are mine." Under such circumstances, why go through the useless ceremony of tendering the debt for which the warrants were pledged, particularly so when the intervenor only prays that he may be adjudged the owner

of the warrants subject to the payment of the indebtedness, and prays that, when the indebtedness is paid, the trustee may be directed to deliver to him the warrants? The appellant was clothed by the Independence National Bank with apparent ownership of the warrants, and, claiming to be such owner, brought this action against the city of Tacoma to establish the validity of the warrants; and, while the Independence National Bank might have been a proper party to the action, it is not a necessary party. The appellant stands in the place of the Independence National Bank so far as his connection with these warrants is concerned, and he holds them subject to all the equities existing in favor of the intervenor. The original action was commenced on May 17, 1898, and the order for leave to intervene was made on June 15, 1898. The complaint of intervention alleges that the Independence National Bank requested the respondent to procure an adjudication on the validity of the warrants, and that on the 10th of December, 1895, the Independence National Bank filed its claim with the respondent, as receiver of the German-American Safe Deposit & Savings Bank, for the loan for which the warrants were pledged; and the further allegation is made that the intervenor had no notice of the sale prior to the time it was made, that no assets came into his hands with which to redeem the warrants, and that this was known to the Independence National Bank; and it is further alleged that the Independence National Bank never informed or notified intervenor that it made an absolute claim of ownership to the warrants, but by its conduct led the intervenor to believe, and he did believe, that the German-American Safe Deposit & Savings Bank had an equity in the warrants. There is nothing in the complaint of intervention showing laches on the part of the intervenor, and we have already held

that the fact that he had another remedy was not material if his petition of intervention showed that he had an interest in the matter in litigation. We think the complaint of intervention stated a cause of action, and that the demurrer to the same was properly overruled. All questions involving the correct determination of this case center around the twenty-second finding of fact, which is as follows:

"That said Independence National Bank of Philadelphia made said attempted sale of said warrants on April 23, 1896, for the sole and only purpose of getting title to said warrants, and not for the purpose of paying said certificate of deposit, and not for the purpose of the liquidation of said certificate of deposit."

The evidence, in our opinion, fully sustains this finding. The German-American Safe Deposit & Savings Bank was a defunct institution, without assets sufficient to pay the cost and expenses of the receiver in winding up its affairs. It was absolutely beyond the power of the receiver knew this; knew also that it must look alone to the city of Tacoma for the payment of the warrants. At the time the sale was made, the Independence National Bank knew that the warrants themselves were valueless, because the city of Tacoma was refusing to pay them, and was refusing to recognize them, with a large lot of other similar warrants, as its obligations, and was contending that the same had once been paid, and that they were nullities; and this contention of the city, according to the undisputed facts, was known to the Independence National Bank as early as June 20, 1895, and from that time until February 18, 1898, when this court, on a rehearing, changed its former views and established the validity of similar warrants. *Bardsley v. Sternberg,* 18 Wash. 612 (52 Pac. 251, 524.) These claims of the city as to the invalidity of the warrants, etc., were well known to the

appellant at the time of the notice of the sale, and at the time of the sale, and the least inquiry would have given the same information as the Independence National Bank possessed to any proposed investor or purchaser. We have a right, under such circumstances, to presume that the Independence National Bank considered the warrants valueless for all marketable purposes, and that offering them for sale was but a mere idle ceremony. We think it is clear that the only object of the sale was to vest the title of the property in the Independence National Bank, so that it might be able to handle it to the best advantage if any opportunity should occur to settle with the city of Tacoma. Mr. Austin, president of the bank, testified: "We sold them in following out a universal practice, when a debt which is not paid, to always sell the securities protecting it *to get title to the property,* so we may be in position to handle it to the best advantage." The object of the sale of a pledge contemplated by the law is to realize thereon in payment of the debt, and, if conducted fairly under the power given to the pledgee, it will not be set aside because the highest market price was not realized.

We will now review the cases cited by the appellant. *King v. Texas Banking & Ins. Co.,* 58 Tex. 669, simply holds that the pledgee is not required to wait until the money market is better; that the parties must have contemplated when the pledge and debt were made that there would be risk of fluctuations in the money market. In *Whitin v. Paul,* 13 R. I. 40, it is held that the pledgee of a chose in action given as a collateral was bound to use reasonable and ordinary diligence in realizing its value, but he was not bound to exercise extraordinary care, and was not bound to watch the market for the most favorable opportunity to sell the pledge. This case is far from supporting the proposition that the pledgee can sell when there

is no market, and when he knows the thing offered for sale, by reason of unforeseen circumstances, is like so much .waste paper, and has lost all its market value, and that ·such circumstances could not have been in contemplation ·of the parties when the pledge was made. Under such conditions it was the duty of the pledgee to take action, or at least he should have requested the pledger to take the necessary steps to establish the validity of the pledge. If the ·pledgor, on such request, should refuse to act, then a sale ·might be made, for the refusal of the pledgor to act would ·be equivalent to an abandonment of the property. In *Franklin National Bank v. Newcombe,* 37 N. Y. Supp. 271, the court simply held that the creditor had a right to collect when his claim became due, and that the debtor could not compel him to wait because it was inconvenient to pay, and a bad time to realize on his assets. The stock and bonds in that case had some market value, and the ·pledgee knew he could realize something on them at the ·sale. The presumptions are all the other way in the case at bar. In the case of *Hewitt v. Steele,* 136 Mo. 327 (38 S. W. 82), the stock had a value, and was sold for its full market value, and the complaint was that it was possible ·to have obtained a greater price for the stock if it had been sold before. The gist of that action was the alleged ·negligence of the debtor in selling stock for less than its value. *Union National Bank v. Forsyth,* 50 La. An. 770 (23 South. 917), simply holds that a sale on a depreciated market is permissible. In that case there was a market rate, and the pledges were sold for such rate. In *Newsome v. Davis,* 133 Mass. 343, it was held that the defendant was bound to exercise reasonable care and diligence to obtain whatever the stocks were worth at the time of sale. These are the cases cited by the appellant to sustain the alleged sale. In all these cases there was a market

value to the thing sold at the time of the sale, and the sale was for the purpose of liquidating the debt and actually realizing on the security.

The power of sale must be exercised with a view to the interests of the pledgor as well as of the pledgee. The unfairness and inequitableness of this case consisted in attempting a sale when the pledgee knew there was no market value for the pledge, knew that he had to look to the pledged property alone for payment, and knew that suits were pending to prove the pledged property of a value far in excess of the amount of the debt for which they were pledged. Under such circumstances we think it was the duty of the pledgee to refrain from a sale of the pledged security until it was determined whether they were valid obligations or not. The Independence National Bank knew that it must get its money only out of the city of Tacoma upon these warrants, and that nothing could be realized from the insolvent pledgor, and that a sale to itself would not add one dollar towards the payment of the debt. It would put the bank, however, in a position to receive almost twice its debt if, by such a sale, it could obtain title, and if the warrants, after litigation thereon, should prove to be valid obligations against the city. If the warrants were invalid, it would realize nothing; and this would be true whether it was the owner or not of the warrants, and whether there was a sale or not. There can be no pretense that there was any intention of realizing money by reason of this sale. The bank had no purchasers in sight, and, under the circumstances, could reasonably expect none. As was said by Judge BELLINGER in *Morris v. Eastside Ry. Co.,* 95 Fed. 13:

"The real character of the transaction shows through all these circumlocutions. The German Savings & Loan Society was not seeking to realize upon its securities, but to

effect a transfer of the title of the bonds held by it to Morris & Whitehead. . . . But whether the pledgee may buy at his own sale is not considered. It is enough to defeat the sale that it was contrived between the seller and the buyer, in order to get the pledgor's title at a sacrifice of his interest, with that result. I am of the opinion that the purchasers of these bonds are only entitled to a decree for the amount of the debts for which the bonds were pledged, and interest and costs; and this conclusion is based upon the fact that the sale to Morris & Whitehead was pre-arranged between the parties, that it was contrived between them as a means of acquiring the property pledged, and that it is immaterial whether the German Savings & Loan Society have any interest in the sale or not. . . . If this is so, it is unconscionable that the mortgagors, or, what is the same thing, the other creditors, shall lose this excess by the expedient of this sale, while some $5,000 of the original debt remains unsatisfied in the hands of the purchaser at the sale. If it shall turn out that the price bid is substantially all that the bonds are worth, then the considerations upon which this decree is based will fail. . . . In that case the purchasers at the sale will not be prejudiced by the decree. In any event they will have their debt and interest, whether that is sufficient to absorb the property or not, and it is all they are equitably entitled to have."

In the case at bar, under the circumstances at the time of the sale, there certainly would be no purchaser for these warrants. The bank made a single bid of $5,000. When the validity of the warrants was finally established by this court, the warrants ceased to be waste paper, and their par value was at once reestablished. The warrants now are worth about $41,000, or some $15,000 more than the claim of the Independence National Bank with interest and expense added. The Independence National Bank not only claims on a debt which originally amounted to $18,000 securities from which it can at any time collect $41,000, but, in addition to this, it also claims an indebt-

edness against the intervenor for some $13,000, the difference between the amount of its bid and its debt, while other creditors of the German-American Safe Deposit & Savings Bank will realize nothing upon their claims. The Independence National Bank is in no way injured by holding this sale invalid, for it will receive, in any event, its entire debt, interest, and expenses, and this is all it is equitably entitled to. Under the circumstances of this case there appears to be no overpowering equity preponderating in favor of the appellant that would justify this court in placing the ownership of these warrants in his hands to the injury of the other creditors of the insolvent German-American Safe Deposit & Savings Bank.

We think, also, that the facts fail to disclose any laches on the part of the intervenor in asserting title to these warrants. The evidence shows that the Independence National Bank, shortly after intervenor's appointment as receiver, made a demand upon the intervenor for payment of its debt against his estate, and threatened, in case of default, to sell the warrants. Intervenor thereupon wrote the Independence National Bank that he was the receiver of the bank without funds, that the Independence National Bank could not realize its debt except out of the warrants held by it as collateral, that the city was refusing payment of these warrants, and that their validity must be established before a purchaser could be found for the same. The Independence National Bank apparently acquiesced in said statement of affairs, and thereafter, on December 10, 1895, filed with the intervenor its verified claim. On April 21, 1896, intervenor received the notice that the Independence National Bank proposed to sell said warrants on the 26th of the same month. Intervenor at once wired the bank that he trusted that they would have no trouble over the warrants, as they hoped to pay them in

full shortly, to which the Independence National Bank made no reply. In October, 1896, intervenor's attorney wrote said Independence National Bank relative to the warrant litigation, treating the warrants as still in pledge. This was allowed to pass by the bank without reply. Following this, in May of 1897, intervenor's attorney and the president of said Independence National Bank had an apparently amicable understanding relative to intervenor's and said Independence National Bank's interest in these warrants, in which President Austin admitted that, if they got their claim and interest, they would be satisfied. Thereafter intervenor's attorney from time to time kept said Independence National Bank posted on the progress of the warrant suits, at all times treating the warrants as still in pledge. All these communications were allowed to pass without response from the Independence National Bank. Intervenor's attorney was certainly looking after this litigation with a view to protecting intervenor's interest in said warrants, and he must have been under an impression, engendered by the silence of said Independence National Bank and the conversation with its president, that intervenor's interest in the warrants still existed.

The intervenor's attorney wrote to the Independence National Bank on the 15th of October and used this language: "Referring to the city warrants which you hold as security for a loan due from the German-American Safe Deposit & Savings Bank of this city, would say," etc. And in the latter part of this letter he used this language: "I think, however, everything will go through satisfactory, and that we will soon be able to adjust your claim in full." On July 12, 1897, in writing to said Independence National Bank, and in speaking of the first decision of this court, he uses this language: "This throws the warrant

holders back upon the proposition of suing the city for money had and received, which we shall do as soon as it is finally determined that the supreme court refuses a rehearing. We herewith enclose you a copy of the decision. I shall write you as soon as the supreme court finally decides the motion above referred to." And on February 20, 1898, after the validity of the warrants was sustained, he writes: "I trust that we can now adjust matters between receiver Balkwill and yourselves in accordance with the plan which I discussed with your Mr. Austin when in your city." This certainly shows that the intervenor and his attorney were keeping close watch on the warrant litigation, and were in the belief that said Independence National Bank would not claim ownership of said warrants. The Independence National Bank, after receipt of these letters written by the intervenor's attorney, by its silence, at least, induced the intervenor to believe that his rights were unimpaired. Under all the circumstances of this case we think that there is nothing from which it might be concluded that the intervenor in any way ratified the sale of these warrants, and we are unable to see wherein he was guilty of laches in asserting his claim to them. We conclude that the sale of the warrants by the Independence National Bank to itself under the circumstances disclosed in this case was for the sole purpose of obtaining title to the warrants, and not for the purpose of realizing thereon in discharge of the indebtedness for which they were pledged. And, being of this opinion, it is unnecessary to further consider whether or not the sale was made on proper notice, and the other questions discussed in the briefs.

The judgment of the lower court is therefore affirmed.

REAVIS, C. J., and FULLERTON and ANDERS, JJ., concur.