TURNER et al. v. METROPOLITAN TRUST CO. OF CITY OF NEW YORK.

In re WESTERN STEEL CORPORATION.

(Circuit Court of Appeals, Ninth Circuit. August 4, 1913.)

No. 2,257.

1. PLEDGES (§ 56*)—SALE OF PLEDGE—RIGHTS OF PLEDGEE AS PURCHASER—BONDS OF PLEDGOR CORPORATION.

That a corporation as collateral to its note pledges its own mortgage bonds does not change the rights of the pledgee under the contract, and where on default the pledgee becomes the purchaser of the bonds at public auction in good faith and strictly as authorized by the contract, it is entitled to enforce the same to their full face value as it might the obligation of a third person, although it exceeds the amount of the debt.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

2. BANKRUPTCY (§ 316*) — PROVABLE CLAIMS — CORPORATIONS — BONDS PURCHASED BY PLEDGEE.

The bankrupt corporation borrowed $600,000 from claimant trust company and to secure its note therefor, which was dated and made payable in New York City, pledged an entire issue of $2,000,000 of its own mortgage bonds. The contract authorized claimant on default to sell the securities at any broker's board or public or private sale without advertisement or notice, which were expressly waived, and further provided that if the sale were at public auction claimant might become the purchaser. Bankrupt made default and was notified by claimant that, unless payment made before, the bonds would be sold at public auction in New York City 30 days after the note matured. Payment not being made, they were sold on the day fixed, after notice by publication the preceding evening and morning in the three papers most generally used for such purpose, and notice by mail to investers in such securities, and were bought by claimant for $25,000. The sale was made at the place designated for such sales by rule of the New York courts and at the regular weekly auction of such securities. The property of the bankrupt consisted chiefly of a steel plant in the state of Washington, which had been operated unsuccessfully, and of undeveloped mining lands in Washington, Nevada, and British Columbia, largely incumbered. The property covered by the mortgage was appraised at more than $350,000 in the bankruptcy proceeding, but its value was speculative and the estimate made largely on hearsay. *Held*, that there was nothing in the circumstances of the sale to impeach the good faith of claimant, nor was the amount bid under all the facts so inadequate as to render it invalid, and that claimant was entitled to prove the bonds against the estate in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 474–477; Dec. Dig. § 316.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Clinton W. Howard, Judge.

In the matter of the Western Steel Corporation, bankrupt. Appeal by Lester Turner, Sutcliffe Baxter, and Edgar Ames, trustees, from an order allowing the claim of the Metropolitan Trust Company of the city of New York. Affirmed.

This is an appeal by the trustees in bankruptcy of the Western Steel Corporation, a bankrupt, from an order of the District Court, Western District of Washington, Northern Division, reversing an order of the referee in bankruptcy in so far as it rejects and disallows the claims of the Metropolitan Trust Company, appellee herein, upon the bonds and note of the Western Steel Corporation. The effect of the order of the District Court is to allow the claims of the trust company in full. As appears by an agreed statement of facts, these claims arose as follows:

In January, 1911, the Western Steel Corporation borrowed $300,000 from the Metropolitan Trust Company, pledging as security therefore $1,800,000 par value of its total issue of $2,000,000 of mortgage bonds. On April 1, 1911, the steel corporation borrowed $300,000 additional, executing a note in the trust company's favor for $600,000, dated April 1, 1911, due August 1, 1911, and pledging the remainder of the bond issue, as well as the $1,800,000 previously pledged, as security for the first $300,000 borrowed. On this note James A. Moore, then president and a very large stockholder in the Western Steel Corporation, became guarantor. By the terms of the note, which was dated and made payable in New York City, the trust company, as pledgee, possessed the right upon nonpayment of the note at maturity to sell the collateral bonds at public or private sale, with or without notice, and the right to become a purchaser if the bonds were sold at a public sale. This power of sale and right to purchase were given in the following language: "The said. company is hereby authorized, upon the nonpayment of any of the liabilities above mentioned when due, to sell, assign and deliver the whole of the said securities, or any part thereof, * * * at any broker's board or at public or private sale, at the option of the said company, without either advertisement or notice, which are hereby expressly waived. If such securities or property are sold at public sale, the said company may itself purchase the whole or any part thereof, free from any right of redemption on the part of the undersigned which is hereby waived and released."

On August 1, 1911, the date of maturity of the note, the trust company sent the following letter to Mr. James A. Moore, president of the Western Steel Corporation, Seattle, Wash.: "I beg to call your attention to the fact that the note of your company for $600,000, of which you are the guarantor, which became due and payable to-day, was not paid. I am instructed to notify you that if the same shall not be paid on or before Monday, August 28, 1911, the securities therefor will be sold at public auction in this city, on Wednesday, August 30, 1911, and that in case there shall be a deficiency, this company will look to you to make good any loss."

Mr. Moore, as president of the Western Steel Corporation, on August .11, 1911, replied to the above letter as follows: "Your favor of the 1st inst. to hand, advising me of the extension of time on the note of Western Steel to August 28th. I expect between now and that time to complete arrangements that will take up the note in full."

No part of the note was paid, and the trust company caused the bonds to be advertised in the New York Evening Post on August 29, 1911, and in the New York Times and Wall Street Journal on the morning of August 30th for sale by public auctioneers at half past 12 o'clock of that day in the city of New York, and caused notices of such sale to be mailed to the principal bond buyers, banking and financial corporations, firms, and individuals in the financial district of New York City. The sale was held as advertised, and the trust company became the purchaser of the bonds, as the highest and best bidder, for the sum of $25,000. This amount, less the expenses of sale, it

credited upon the note for $600,000. The bonds had never been listed as standard securities, and, concerning their value and the properties which they covered, no definite information was possessed by the commercial world.

The properties of the bankrupt consisted of a number of undeveloped mines and iron ore, limestone, and other minerals in British Columbia, Washington, and Nevada, the values of which properties were highly uncertain. In the course of the bankruptcy proceedings the Nevada iron properties were appraised at $25,000, but there was a claim for a vendor's lien thereon in the sum of about $100,000, for which claim proceedings in foreclosure were pending at the time of the institution of these proceedings. There was a steel manufacturing plant and blast furnace in the state of Washington which had been operated intermittently and unsuccessfully but under unfavorable conditions of management. It is agreed that the manufacture of steel is conceded to have been an experimental industry on Puget Sound, "and the suitability of the plant's location, the adequacy and suitability of its construction and equipment, and the possibility of its profitable operation were then in doubt and dispute both in the commercial world generally and in New York, as well as in Seattle and in the state of Washington." Another estate was a tract of land on Graham Island in British Columbia. The interest of the Western Steel Corporation in this tract was this: The steel corporation owned seven-eighths of the stock of a Canadian corporation called the Western Coal & Iron Corporation. This Canadian corporation did not own the land but had an option upon it held in escrow in British Columbia. When the securities of the Western Steel Corporation were sold in New York, and when bankruptcy proceedings were instituted, there was due and payable upon these lands, under pain of forfeiture of the escrows, $250,000, and there had been paid upon the lands about $150,000. The escrow agreements called for annual payments of $50,000, with interest payable semiannually, and provided for absolute forfeiture of all past payments and cancellation of the option in case of 20 days' default in payment of principal or interest. The shares of stock of the Western Steel Corporation in the Western Coal & Iron Corporation were, at the time of the sale of the bonds in New York and at the time of the bankruptcy proceedings, deposited with the trust company as an asset correctly described in the trust deed as held for the security of the bondholders. The right of James A. Moore and the Western Steel Corporation to the shares of stock in the Western Coal & Iron Corporation were, however, at the time of the sale of the bonds in New York and at the time of the bankruptcy proceedings, in litigation in the courts of British Columbia. When the bonds were sold in New York, the Graham Island lands were known to contain a deposit of coal and certain timber; the coal had never been exploited but the timber was reported to be worth a good share of the purchase price remaining unpaid.

When the bonds were sold in New York, about $25,000 was due to laborers employed upon the steel plant, and this sum constituted a lien upon the plant prior to the mortgage securing the bonds held by the trust company. The appraisers in bankruptcy found that the interest of the bankrupt in the Graham Island property, as represented in the stock of the Western Coal & Iron Corporation, was worth about the sum of $200,000, although the appraisers stated that they believed that the value of the property, if developed in connection with the operation of the steel plant as a going concern, would be greatly above the figures named.

The appraisers valued the steel plant, blast furnace works, and plant site, with all machinery and equipment used in connection therewith, at $99,035 on the basis of a quick sale for cash but with the explanation that, valued as a going concern properly financed, the same property with certain material and supplies would be worth $399,942. The valuation placed upon the estates of the steel corporation, both under and outside the mortgage, amounted to $458,141, estimated upon the basis of a quick sale for cash; but the same properties were found by the appraisers to be worth much more than this sum if operated as a going concern adequately financed.

It further appears that the estates of the bankrupt corporation were sold after repeated advertisements in the Seattle and another Washington paper,

and also in newspapers published in British Columbia and Nevada. The Metropolitan Trust Company bought the property in for the sum of $720,000, making payment in bonds to the extent of $647,010 and in cash to the extent of $72,990. This sale was confirmed by the District Court sitting in bankruptcy.

The newspapers in New York, in which the sale of the bonds was advertised, are generally considered in the city of New York to be the best media for reaching bidders and buyers of stocks, bonds, and financial securities generally; one of them being the paper designated by the United States District Court in Bankruptcy for the Southern District of New York for the publication of auction sales. The place of the sale was the place designated by the general rules of practice of the Supreme Court of the state of New York for public auction sales and is the usual and proper place for conducting such sales. The bonds were sold at a regular auction held weekly at the time and place for the sale of stocks, bonds, and financial securities and was largely attended by buyers of financial securities. It is agreed that the proceedings for the sale of these securities, the notice given, and the manner in which the sale was advertised and conducted were such as are customary, regular, and usual in the sale of listed or known stocks, bonds, and financial securities marketable in the city of New York. No attack on the sale was made by the steel corporation, and no question as to the validity of the sale was ever raised until after bankruptcy proceedings were instituted against the corporation.

On October 26, 1911, the steel corporation was adjudged a bankrupt in the United States District Court, and the trust company as an unsecured creditor presented its claim in bankruptcy for the amount of the unpaid balance of the note for $600,000. It did not at that time present any claim for the bonds but did at all times assert its ownership of the bonds as separate obligations of the bankrupt. The bonds were of a total issue of $2,000,000 face value, secured by general trust deed upon the properties of the bankrupt, with Carnegie Trust Company and Lawrence A. Ramage as trustees for the bondholders. For these two trustees the Metropolitan Trust Company and James F. McNamara had become substitutes before and at the time of the loan of $600,000 and were the trustees for the bondholders at the time of the proceedings in bankruptcy. The trust deed purported to cover all the properties of the bankrupt but, in so far as personalty was concerned, was defective because it lacked the chattel mortgage affidavit required by laws of the state of Washington, and as to personal property, save the shares of stock actually delivered in pledge thereunder, was not binding.

The trust company filed proof of claim on the issue of $2,000,000 of bonds, together with the entire issue of bonds and the mortgage securing the same, and prayed that, after crediting the amount for which the same should be used in paying for the properties covered by the mortgage and purchased at the bankruptcy sale, it be allowed as a general claim against the estate.

The trustee and referee allowed the claims for the amounts actually advanced by the trust company, with interest, but rejected the balance of the claims on the ground that the trust company acquired no title to the bonds by reason of the sale above mentioned. In due course the district court reversed the action of the referee and held that the sale, being subject to the laws of New York and having been conducted in the usual and customary manner and in accordance with the laws of that state, was valid; that mere inadequacy of price was insufficient to justify the setting aside of the sale; and that in any event the schedule and report of the appraisers showed that the properties owned by the bankrupt corporation were widely scattered, incumbered, and to a great extent unpaid for.

Munn & Brackett, of Seattle, Wash., for appellants.

Frederick Bausman, Daniel Kelleher, Robert P. Oldham, and Robert C. Goodale, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The contract between the corporation and the trust company, like many contracts of pledge, was entered into in consideration of a cash loan by the pledgee to the pledgor. The loan was made in reliance upon the collateral and on the pledgor's contract that the collateral might be sold and the pledge relationship ended at the time and in the mode expressly set forth in the contract of pledge; that upon nonpayment of the note for $600,000 the trust company was authorized to sell, assign, and deliver the whole of the securities or any part thereof "at any broker's board or at public or private sale, at the option of the said company, without either advertisement or notice which are hereby expressly waived." We need not dwell at length upon the validity of the general features of such a contract, because the appellants say in their brief that a provision in a contract of pledge that the pledgee may sell the collateral without notice to the pledgor is valid and binding; they admit that where a pledge agreement provides that the collateral may be sold at private rather than public sale the stipulation is valid; and they concede that a provision that a pledgee may become the purchaser at a public sale if the sale is conducted in strict good faith and in accordance with the terms of the contract is valid. Nevertheless they say that this case is distinguishable because the trust company was not merely trustee for the pledgor but for a pledgor which had placed itself entirely in the power of the pledgee by the waiver of all the common-law safeguards in that the pledgee had power to sell without notice or advertisement at public or private sale, and at the public sale was authorized to become the purchaser of the pledgor's obligation. In their argument that these bonds were never out of the possession of the trust company pledgee, that no new consideration passed, and that no public sale held on the advertisement given could be valid, appellants make these contentions:

First. That, where the pledged collateral consists of an obligation of the pledgor in a greater amount than is due and the collateral is purchased by the pledgee, he cannot enforce it against the pledgor in an amount greater than the sum originally loaned.

Second. That the intent of the pledgee in making a sale on less than 24 hours' notice must be held to have been to acquire title to the collateral by bare literal compliance with the power of sale or wantonly to sacrifice the equity of the pledgor.

Third. That a sale without notice to the public is not a public sale, and that a just construction of the pledge agreement in the present case is that advertisement was waived by the pledgor only in case of private sale.

Fourth. That the duty of the pledgee was to obtain the highest cash value out of the collateral, and that, if it failed to act fairly in the conduct of the sale with such purpose in view, the sale must be held invalid without regard to the terms of the pledge agreement.

Fifth. That under the facts of the present case inadequacy of price is so great as to constitute conclusive proof of lack of good faith on the part of the pledgee in the conduct of the sale.

[1] The attempt to make a distinction between the rule which gov-

erns contracts of pledge, where the pledgor prefers to pledge its own mortgage bonds as collateral, and that which governs such contracts, where the pledgor pledges the bonds of another corporation, is not well founded. The contract measures the rights of the parties; and where the expressed intention is that in case of foreclosure the bonds deposited may be sold as existing securities, and the pledgee is given the right to become the purchaser, why should there be any less good title conveyed to such purchaser than if he were selling the bonds of another corporation? The reason for permitting the pledgee to become a purchaser is to permit him to buy the bonds, if he should wish to do so, at a price higher than any one else will pay for them. Granting that under such a contract the relationship of a pledgee to the bonds may offer temptation to sacrifice the rights of the pledgor, still, if upon close scrutiny it appears that a sale has been fairly made and the right to become a purchaser has been specifically given to the pledgee by the agreement between the parties, the exercise of such a right must be upheld and its attendant advantages, whatever they may be, must be accorded to the purchaser. To hold otherwise would be to say that the courts can make a contract which will materially change the relationships of the parties by depriving one of them, in case of default by the other, of the right to acquire full legal title to the thing pledged. The essential characteristic by which a pledge is distinguished from a common-law lien is that the article pledged may be sold by the pledgee upon the nonperformance of the pledgor's obligation. A sale divests the title of the pledgor and gives to the purchaser a good title to the property pledged; the pledgee selling both his own interest and all the right which the pledgor could have empowered him to sell at the time the contract of pledge was made.

The facts here fail to show the features of a mortgage. The transaction was a mere lien with respect to bonds of a corporation. There was no conveyance of legal title upon an express condition subsequent but delivery of personal property by a debtor, in security for a debt, accompanied by a written agreement whereby the debtor agreed that, if he did not pay the debt by a certain time, the creditor might dispose of the property to pay the debt. Jones on Collateral Securities (3d Ed.) § 8. A corporation which has issued its bonds frequently pledges them as collateral security for a debt. Nor is it unusual that in suits for forclosure the bonds pledged are offered at public sale and are purchased by the pledgee, who is entitled to the full face value of the bonds. Cases where this rule has been recognized by the courts are Farmers' Loan & Trust Co. v. Toledo & S. H. R. Co., 54 Fed. 759, 4 C. C. A. 561; Gilchrist Transportation Co. v. Phœnix Ins. Co., 170 Fed. 279, 95 C. C. A. 475; Atlantic Trust Co. v. Woodbridge Canal & Irrigation Co. (C. C.) 86 Fed. 975; and Bush v. Adams (C. C.) 165 Fed. 802.

In re Woods' Estate, 52 Md. 520, decided in 1879, is a learned discussion of the attitude of a creditor who held under a pledge agreement notes of his debtor of a face value largely in excess of the sum loaned to the debtor; such notes being delivered as collateral security for the actual debt of the debtor. The court, among other things, said:

"It is true the effect of carrying out these contracts by a sale of the notes was to increase the general indebtedness of the firm, but it did not increase the debt then due the Garretts for which the notes were pledged as security. But this increase of general indebtedness is exactly what the contracts contemplated and what the parties intended in case a sale was made, so that the question comes back at last to the validity of the contracts in this respect. Now, if instead of giving these notes, in the form in which they were drawn, to the Garretts as collateral security, the firm had placed them in the hands of a broker for sale, and he had sold them to the same parties and for the same price the Garretts obtained for them, and the firm had received the proceeds and applied them to this debt, exactly the same result would have followed. There would have been the same increase of the general indebtedness of the firm and the same diminution of the Garrett debt which was effected by the sale under the contracts, and in the case supposed it will hardly be contended that the purchasers would not have had a valid claim against the firm for the full amount of the notes. Such notes are constantly sold on the streets in all the large commercial cities of the country, and it is not uncommon for merchants to resort to this mode of raising money. However hazardous it may be, there is nothing unlawful in it, and it cannot be doubted but that the purchasers acquire a good title to such paper. It is apparent to my mind that it was in view of this recognized practice, and the acknowledged rights of purchasers in such cases, that these contracts were made and the notes sold thereunder."

Appellant cites Peacock v. Phillips, 247 Ill. 467, 93 N. E. 415, 32 L. R. A. (N. S.) 42, as sustaining a contrary contention. The court there seems to have followed the settled law of the Illinois jurisdiction and interpreted the power of sale given in the contract in the case as merely enabling the bank to do an act to obtain payment which could not otherwise be done, but not as conferring a power to bestow a greater right upon the purchaser with full notice of the facts and circumstances and the extent to which the bank could enforce the obligation than the bank would have had in case of foreclosure. The case loses much strength as an authority herein because it expressly recognizes that corporate bonds are upon a different footing from promissory notes, secured by trust deeds, given as collateral.

[2] Inasmuch as the contract involved herein was not in itself invalid, its provisions became enforceable unless it appears that, in the manner of enforcement, some wrong was done to the steel corporation. Of course the power of sale must have been fairly exercised; but, if it was pursued under the letter as well as the true spirit of the contract, there can be no conclusion of unfairness or of sacrifice of the equity of the pledgor. The terms of an agreement of pledge may be severe; but, if they are complied with, it is but carrying out the intention of the parties. The notice sent on August 1, 1911, by the Metropolitan Trust Company to the Western Steel Corporation made it perfectly plain that unless the note of the corporation was paid on or before Monday, August 28th, the securities would be sold at public auction on Wednesday, August 30th. This gave the steel corporation more than three weeks' time within which to perfect an expected "arrangement" whereby they would take up the note in full before sale of the securities. But they failed to do anything. Then the pledgee, as authorized by the contract, proceeded to sell at public sale after notice published in those New York papers customarily used by pledgees in New York to give notice of sales of pledged col-

lateral. The sale was made at a regular weekly auction in salesrooms in New York where buyers of securities congregate; the auctioneers who conducted the sale were well known as carrying on a large business in selling stocks and bonds; the salesrooms were those designated by the rules of practice of the Supreme Court of the state of New York for the sale of real estate; and the sale was made to the persons who made the highest bid.

Thus far we can find no prejudice to the rights of the steel corporation. That the notice of sale was published for only one day before the sale and upon the day of the sale is not evidence of wrongdoing, for the contract expressly authorized a sale, public or private, "without either advertisement or notice" which were expressly waived. The contract was not unusual, nor was the notice for less time than is customarily given. The pledgor itself had had ample notice that a sale would be made, yet made no objection to the contemplated step. Moreover, the trustees offer no evidence to the effect that, if longer advertisement had been had, better bids would probably have been made. Indeed, they presented no testimony whatever of an affirmative character which would warrant this court in reversing the decision of the court below. The argument of inadequacy of price paid for the bonds is pressed with much earnestness. Reiterating the elementary rule that if there were any evidence of wanton disregard of the rights of the pledgor, or any such gross inadequacy of price as to raise a presumption of fraud, the sale should be set aside, nevertheless we find nothing in the record to show that the price paid or the circumstances surrounding the sale indicate fraud or lack of good faith. It is true that the appraisal in bankruptcy, which was made several months after the sale, showed that the whole property covered by the bond issue was worth at least $366,035, and much more as a going concern properly financed; but the estimates of value put upon the mineral claims were based largely upon hearsay and apparently in some instances were not made with full information of the state of the liens pending against certain of the property appraised. The appraisers reported that the coal properties required development work before it would be possible to realize upon them; foreclosure would have to be made in several matters where liens existed; and liens for labor would have to be satisfied. The steel plant had never been operated successfully, nor did the pledgor when it pledged its bonds put any estimated value upon them in the contract of pledge, although in the body of the contract there was a description of the bonds and a space in which to insert an "estimated market value of $————."

In the light of all these circumstances, there is ample support for the decision of the court below holding that neither gross inadequacy of price nor fraud was established or could be presumed. As said by the court in its opinion:

"The schedule and the report of the appraisers show that the properties owned by the bankrupt corporation are widely scattered, incumbered, and largely unpaid for. Their value is uncertain and highly problematic at best. Suffice it to say on this branch of the case that no such inadequacy of price is shown as would shock the conscience or raise a presumption of fraud where it is conceded that no fraud was practiced or existed."

Muhlenberg v. Tacoma, 25 Wash. 36, 64 Pac. 925, cited by appellants, is not directly pertinent because the court found that the sale of the pledge was with the object of getting title to the property. Perkins v. Applegate (Ky.) 85 S. W. 723, was a case where the facts disclosed false statements and positive deception and improper conduct.

As sustaining a sale made where the procedure was much like that pursued in the present case, the following cases are relevant: Farmers' Loan & Trust Co. v. Toledo & S. H. R. Co., supra; Morris & Whitehead v. East Side Ry., 104 Fed. 409, 43 C. C. A. 605; Wheelwright v. St. Louis, N. O. & O. C. T. Co. (C. C.) 56 Fed. 164: Fidelity Insurance Co. v. Roanoke Iron Co. (C. C.) 81 Fed. 439; Farmers' National Bank v. Venner, 192 Mass. 531, 78 N. E. 540, 7 Ann. Cas. 690; In re Mertens, 144 Fed. 818, 75 C. C. A. 548; Hiscock v. Varick Bank of New York, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945.

We think that these views sufficiently meet the main points of appellants' case. We have given very careful consideration to the arguments, and our conclusion is that the contract was valid and that there is no sufficient reason advanced for setting aside the sale made thereunder and denying to the appellee the full benefit of its securities.

Decree affirmed.